STATE OF MICHIGAN
COURT OF APPEALS

ALESA JAMES CARR,

      Plaintiff-Appellant,

v

MICHAEL WAYNE CARR,

      Defendant-Appellee.

UNPUBLISHED
July 19, 2016

No. 326782
Oakland Circuit Court
LC No. 2013-810368-DM

---

ALESA JAMES CARR,

      Plaintiff-Appellant,

v

MICHAEL WAYNE CARR,

      Defendant-Appellee,
and

DAVID M. FINDLING,

      Appellee.

No. 331699
Oakland Circuit Court
LC No. 2013-810368-DM

---

Before: WILDER, P.J., and MURPHY and O'CONNELL, JJ.

PER CURIAM.

These consolidated appeals concern the divorce of plaintiff, Alesa James Carr, from her former husband, Michael James Carr. We affirm in part, vacate in part, and remand for further proceedings.

## I. DOCKET NO. 326782

## A. SUPPORT AWARDS

Plaintiff first challenges the trial court's child support and spousal support awards. While we find the majority of her contentions without merit, we agree that the trial court failed to state adequate findings to support the income imputed to plaintiff for purposes of calculating child support.

## 1. DEFENDANT'S INCOME

Plaintiff first contends that the trial court erred in its calculation of defendant's income for purposes of child support. We disagree. "Generally, child support orders . . . are reviewed for an abuse of discretion." *Clarke v Clarke*, 297 Mich App 172, 178-179; 823 NW2d 318 (2012). "However, whether the trial court properly applied the MCSF presents a question of law that [this Court] review[s] de novo." *Id*. at 179. "[F]actual findings underlying the trial court's decisions are reviewed for clear error." *Id*.

As explained in *Clarke*:

> MCL 552.519(3)(a)(*vi*) grants the State Court Administrative Office Friend of the Court Bureau the authority to develop a formula for establishing and modifying child support obligations. A trial court must use the formula established by the Friend of the Court Bureau when determining child support, and may deviate from the formula only if the formula would be unjust or inappropriate based on the facts of the case. The trial court must set forth in writing or on the record the reasons for the deviation. Just as with a statute, courts must comply with the plain language of the MCSF, and may not read language into the MCSF that is not present. [*Id*. (citations omitted).]

In *Diez v Davey*, 307 Mich App 366, 376-377; 861 NW2d 323 (2014), this Court explained:

> The MCSF was designed "based upon the needs of the child and the actual resources of each parent." MCL 552.519(3)(a)(*vi*). Under the MCSF, the first step in calculating each parent's support obligation involves determination of both parents' individual incomes. 2013 MCSF 2. "The objective of determining net income is to establish, as accurately as possible, how much money a parent *should* have available for support." 2013 MCSF 2.01 (B) (emphasis added). The MCSF directs that "[a]ll relevant aspects of a parent's financial status are open for consideration when determining support," 2013 MCSF 2.01(B), and a parent's income calculated under the MCSF "will not be the same as that person's take home pay, net taxable income, or similar terms that describe income for other purposes," MCSF 2.01(A).

The MCSF includes a number of sources of compensation as income for purposes of calculating child support. See 2013 MCSF 2.01(C). One such source of compensation is "[e]arnings generated from a business, partnership, contract, self-employment, or other similar

arrangement, or from rentals." 2013 MCSF 2.01(C)(2). With regard to business owners, such as defendant, the MCSF provides a list of certain types of compensation that should be carefully examined, which includes "[d]istributed profits, profit sharing, officers' fees and other compensation, management or consulting fees, commissions, and bonuses." 2013 MCSF 2.01(E)(4)(a). The MCSF further instructs:

> (d) Reduced or deferred income. Because a parent's compensation can be rearranged to hide income, determine whether unnecessary reductions in salaries, fees, or distributed profits have occurred by comparing amounts and rates to historical patterns.
>
> (*i*) Unless the business can demonstrate legitimate reasons for a substantial reduction in the percentage of distributed profits, use a three-year average to determine the amount to include as a parent's income.
>
> (*ii*) Unless a business can demonstrate legitimate reasons for reductions (as a percentage of gross business income) in salaries, bonuses, management fees, or other amounts paid to a parent, use a three-year average to determine the amount to include as a parent's income. [2013 MCSF 2.01(E)(4).]

In this case, defendant's total income from his various business ventures exceeded $800,000 in 2012 and 2013. This income included a monthly fee from Archer Corporate Services (ACS) of $17,000 (or $204,000 annually), a bonus from ACS of $50,000, and substantial distributions through his ownership share of DRM Group, LLC, which, in turn, owned a portion of ACS. He also received distributions through his ownership of Detroit Metro Ventures (DMV), and for a time, he received a $2,500 monthly fee from Wireless Resources, Inc. (WRN).

However, as defendant explained at trial, his present income was substantially less than in the past. Defendant had not received a consulting fee from WRN since 2013. DMV ceased its operations in 2014, and defendant would receive no more income from that entity. While he would continue to receive the same management fee from ACS, his bonus dropped to $20,000. The largest loss of income was due to the fact that defendant would not receive any distributions from ACS in 2014. The reason for this was thoroughly explained at trial. ACS had been the victim of embezzlement that occurred in 2012 and 2013, but was not discovered until 2014. There was no realistic hope of recovering the stolen funds through insurance or other sources. In addition, ACS expected to lose business from three major customers, causing a drop of approximately $6M in gross revenue. ACS's board of directors had voted against providing any distributions for 2014 due to these concerns. Justin Cherfoli, a neutral expert who had examined the businesses, agreed that going forward, defendant's income would consist of the $17,000 monthly salary he received from ACS, and potentially, a bonus. Cherfoli could not speak to whether any distributions would be forthcoming in 2014, but noted that due to the embezzlement, there would be a working capital shortfall at ACS.

Plaintiff contends that the trial court erred by not using a three-year average to determine defendant's income. The trial court did not so err. As described, the record demonstrated legitimate reasons for the reduction in defendant's income. Thus, the trial court was not required

to use a three-year average to determine defendant's income. The trial court's conclusion that defendant's income would consist only of his management fee from ACS and a bonus of $20,000 was well-supported by the testimony from defendant and Cherfoli. The trial court did not clearly err when it found defendant's income to be $224,000 a year.

Plaintiff argues that because Cherfoli relied on information provided by defendant, and because (at least as far as plaintiff is concerned) defendant was not credible, the trial court should not have relied on Cherfoli's testimony. At trial, Cherfoli was asked whether he had any concerns regarding the completeness and veracity of the information provided to him by defendant. Cherfoli stated that he was very confident in his analysis. He noted that defendant was very responsive to his requests for documentation. Much of defendant's testimony went to explaining his business ventures, the businesses' finances, and what income he could expect to receive from these businesses. The trial court explicitly found Cherfoli credible, and because Cherfoli relied on the information he received from defendant, the trial court also clearly found defendant credible. This Court "must defer to the special ability of the trial court to judge the credibility of witnesses." *In re Gach*, ___Mich App___, ___; ___NW2d___ (Docket No. 328714, April 19, 2016), slip op at 4. Plaintiff's disagreement with the trial court's credibility determinations does not demonstrate clear error.[1]

We further note that plaintiff's suggested calculations of defendant's income are deeply flawed. Plaintiff asserts that this Court should average defendant's income from 2011 to 2013, which results in an income of $760,532. But she then adds nearly $600,000 to this amount purportedly to reach an "annual gross income of approximately $1,350,000." The income levels discussed already state defendant's gross income before taxes, not his net income after taxes. Plaintiff's addition of nearly $600,000 is wholly unsupported in fact or logic.[2]

## 2. IMPUTED INCOME

Plaintiff next contends that the trial court erred when it imputed $50,000 in income to her for purposes of child support. We agree.

When calculating a parent's income available for child support, the trial court is not limited to considering the actual income earned by a parent; it may also consider the "potential

---

[1] It must be remembered that unlike this Court, the trial court was able to see and hear the testimony of the witnesses. It could observe their demeanor and gain a much better sense of their candor (or lack thereof). As our Supreme Court explained over a hundred years ago, "[t]here are many aids possessed by the judge who hears the oral testimony in deciding who of the witnesses are truthful that do not get upon the printed page." *Donaldson v Donaldson*, 134 Mich 289, 291; 96 NW 448 (1903).

[2] Indeed, in her motion for relief from judgment, plaintiff argued that "[u]tilizing a 3 year income average, . . . [defendant]'s income, for purposes of child and spousal support should be $760,532.00." Thus, plaintiff's current calculation of defendant's income is not only incorrect, but is contrary to the most recent position she took in the trial court.

income that parent could earn, subject to that parent's actual ability." 2013 MCSF 2.01(G). However, the trial court may only do so if the parent "is voluntarily unemployed or underemployed, or has an unexercised ability to earn . . . ." 2013 MCSF 2.01(G). Plaintiff contends that no income should be imputed to her because she was not voluntarily unemployed or underemployed. The record established that plaintiff is a licensed attorney and business owner. While she now contends that she has not worked since 1999, plaintiff testified at trial that she was working 30 or more hours each week for her businesses until she filed for divorce, after which she "greatly tapered off" working. Plaintiff is also a healthy individual. And when asked directly, plaintiff testified that she fully intended to work after the divorce was completed. The record easily supports a conclusion that plaintiff was voluntarily unemployed and that she had an unexercised ability to earn. The trial court did not abuse its discretion when it found it proper to impute some amount of income to plaintiff.

However, plaintiff correctly notes that the trial court did not adequately explain how it arrived at a figure of $50,000. With regard to imputed income, 2013 MSCF 2.01(G) provides:

(2) Use relevant factors both to determine whether the parent in question has an actual ability to earn and a reasonable likelihood of earning the potential income. *To figure the amount of potential income that a parent could earn, consider the following*:

(a) Prior employment experience and history, including reasons for any termination or changes in employment.

(b) Education level and any special skills or training.

(c) Physical and mental disabilities that may affect a parent's ability to obtain or maintain gainful employment.

(d) Availability for work (exclude periods when a parent could not work or seek work, e.g., hospitalization, incarceration, debilitating illness, etc.).

(e) Availability of opportunities to work in the local geographical area.

(f) The prevailing wage rates in the local geographical area.

(g) Diligence exercised in seeking appropriate employment.

(h) Evidence that the parent in question is able to earn the imputed income.

(i) Personal history, including present marital status and present means of support.

(j) The presence of the parties' children in the parent's home and its impact on that parent's earnings.

-5-

(k) Whether there has been a significant reduction in income compared to the period that preceded the filing of the initial complaint or the motion for modification. [Emphasis added.]

"These factors generally ensure that adequate fact-finding supports the conclusion that the parent to whom income is imputed has an actual ability and likelihood of earning the imputed income." *Berger*, 277 Mich App at 725-726. In its explanation of its child support decision, the trial court did no more than state that it would impute $50,000 of annual income to plaintiff.[3] Clearly, this does not amount to adequate fact-finding.

Despite a lengthy trial below, which afforded the parties ample opportunity to present evidence on the relevant factors, defendant failed to present any evidence regarding what might be considered the most important of the factors provided by 2013 MCSF 2.01(G)(2): factor (e), the "[a]vailability of opportunities to work in the local geographical area[,]" and (f), [t]he prevailing wage rates in the local geographical area." The record, therefore, is bereft of evidence that would permit a rational application of the factors under 2013 MCSF 2.01(G)(2). As such, we vacate the trial court's decision to the extent it imputed income to plaintiff and order the trial court, on remand, to recalculate the child support award without imputed income to plaintiff.

## 3. SPOUSAL SUPPORT

Plaintiff next contends that the trial court's spousal support award was an abuse of discretion. We disagree. "It is within the trial court's discretion to award spousal support, and we review a spousal support award for an abuse of discretion." *Loutts v Loutts*, 298 Mich App 21, 25; 826 NW2d 152 (2012). "An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes." *Id*. at 26 (quotation omitted). The trial court's factual findings are reviewed for clear error. *Id*. "If the trial court's findings are not clearly erroneous, [this Court] must determine whether the dispositional ruling was fair and equitable under the circumstances of the case." *Id*. The trial court's dispositional ruling must be affirmed unless the appellate court is firmly convinced that it was inequitable. *Id*.

The trial court ordered defendant to pay plaintiff $5,000 monthly in spousal support. Based on her incorrect belief that defendant's income is $1.35M annually, an in reliance on a software program's determinations that are based on this figure, plaintiff contends that she is entitled to an award approaching $20,000 each month. As explained, the trial court did not clearly err when it found defendant's income was $224,000 annually. Plaintiff, however, requests an award that would amount to more than defendant's entire annual income. "The object in awarding spousal support is to balance the incomes and needs of the parties so that *neither* will be impoverished . . . ." *Berger v Berger*, 277 Mich App 700, 726; 747 NW2d 336

---

[3] It appears that this figure was derived from defendant's proposed findings of fact and conclusions of law submitted to the trial court after the trial was completed. Similarly, defendant's submission to the trial court contained no explanation of how he arrived at this figure.

(2008) (emphasis supplied). Clearly, awarding plaintiff the sum she seeks would impoverish defendant.

This Court has explained the factors that may be considered when determining an appropriate spousal support award:

> (1) the past relations and conduct of the parties, (2) the length of the marriage, (3) the abilities of the parties to work, (4) the source and amount of property awarded to the parties, (5) the parties' ages, (6) the abilities of the parties to pay alimony, (7) the present situation of the parties, (8) the needs of the parties, (9) the parties' health, (10) the prior standard of living of the parties and whether either is responsible for the support of others, (11) contributions of the parties to the joint estate, (12) a party's fault in causing the divorce, (13) the effect of cohabitation on a party's financial status, and (14) general principles of equity. [*Olson v Olson*, 256 Mich App 619, 631; 671 NW2d 64 (2003).]

Ultimately, "alimony is to be based on what is just and reasonable." *Id.* As the trial court explained, plaintiff is a healthy, well-educated individual. She is a licensed attorney who owns two businesses. Plaintiff also expressed her desire to seek employment. She has been awarded a very substantial amount of property in the divorce. Clearly, the parties enjoyed a high standard of living in the past. But as the trial court noted, plaintiff's apparent expectation that this lifestyle continue unchanged is completely unreasonable. In addition to her share of the marital estate, plaintiff has been awarded the equivalent of $60,000 a year, approximately 27% of defendant's annual gross income. On the whole, we cannot conclude that the trial court's spousal support award was inequitable. Thus, it must be affirmed. *Loutts*, 298 Mich App at 26.

## B. ATTORNEY FEES

Plaintiff next contends that the trial court abused its discretion when it declined to award her attorney fees and expert witness fees. We disagree. This court's review of a trial court's decision whether to award attorney fees is reviewed for an abuse of discretion. *Diez*, 307 Mich App at 395. The court's factual findings are reviewed for clear error, and any questions of law are reviewed de novo. *Id.*

Plaintiff's argument breaks down into three essential points: first, that she cannot afford her fees; second, that the trial court's findings were inaccurate and incomplete; and third, that as a matter of equity, defendant should at least pay the portion of her fees that went to discovering the embezzlement at ACS. Each of these contentions lacks merit.

Turning first to the question of whether the trial court made sufficient findings, plaintiff does correctly note that the trial court's analysis of the issue in its initial opinion was not adequate. The trial court discussed only plaintiff's decision to hire an expert and its belief that plaintiff's actions in litigation caused unnecessary expense. This does not fully address the question posed by MCR 3.206(C)(2)(a), which is the parties' respective abilities to bear the

expense of litigation.[4]  See *Myland v Myland*, 290 Mich App 691, 702-703; 804 NW2d 124 (2010) (in response to a request for attorney fees in a divorce action, the trial court focused whether there was "egregious conduct" or "wastefulness" by the parties; because this was the incorrect legal framework to address a request under MCR 3.206(C)(2)(a), the matter was remanded to allow the trial court to apply the correct legal framework).

However, when it considered plaintiff's motion for relief from judgment, the trial court provided additional explanation.  The trial court explained that plaintiff had been awarded significant assets, including her businesses and spousal support.  It also noted that she was a licensed attorney who was capable of earning a living.  And when it denied plaintiff's motion to stay enforcement of the divorce judgment, the trial court again explained that both parties were able to pay their fees.  This additional explanation, while not highly detailed, addressed the necessary inquiry and provides the "[b]rief, definite, and pertinent findings and conclusions" necessary to allow appellate review.  MCR 2.517(A)(2).

The record also supports the trial court's ultimate conclusion that plaintiff is capable of paying her attorney fees.  Plaintiff contends that she does not work and that her sole source of income is derived from the support payments she receives from defendant.  She explains that the only way she may afford her fees is to liquidate the "meager assets" she received in the divorce.  As the trial court explained, plaintiff received significant assets in the divorce judgment, totaling over $1M.  Beyond these assets, plaintiff was awarded $5,000 each month in spousal support.  And while she contends she does not work and cannot earn an income, plaintiff is well able to earn an income if she chooses.  Indeed, she expressed her desire to earn an income on her own at trial.  Thus, plaintiff should be capable of paying her fees without liquidating the majority of the assets she was awarded in the divorce.

Nor should it be forgotten that while the divorce was pending, plaintiff received several advances from the marital estate to pay her attorney fees.  She also received $13,000 each month from defendant under the status quo order and an additional sum of nearly $900 to pay the lease on her vehicle.  During the pendency of the case, defendant also paid the mortgage for the home plaintiff resided in, and numerous other expenses.  It is fairly apparent that any difficulty plaintiff is currently experiencing with regard to her attorney and expert witness fees bears at least some correlation to her decision to prioritize her own lavish spending over the debt she was incurring to her attorneys.  In any event, the trial court did not abuse its discretion when it found that plaintiff could afford to pay her attorney and expert witness fees.

---

[4] That said, this Court has interpreted MCR 3.206(C)(2)(a) "to require an award of attorney fees in a divorce action only as necessary to enable a party to prosecute or defend a suit." *Myland v Myland*, 290 Mich App 691, 702; 804 NW2d 124 (2010) (quotation omitted).  Thus, if certain expenses were not necessary to enable plaintiff to prosecute her divorce action, those fees should not be included in an award.  But the question whether plaintiff has the ability to pay those fees necessary to enable her to prosecute the divorce remains unanswered by the trial court's initial opinion.

Finally, plaintiff contends that because Brenda Orlando's[5] investigation led to the discovery of the embezzlement at ACS, defendant should be required to pay those fees associated with this investigation. Plaintiff cites *Merkel v Long*, 372 Mich 144; 149-150; 125 NW2d 287 (1963), for the premise that "where 1 of many parties having a common interest in a trust fund, at his own expense takes proper proceedings to save it from destruction and to restore it to the purposes of the trust, he is entitled to reimbursement." *Merkel* is of no relevance. There exists no trust fund, and no proceedings were taken to save anything from destruction. The situation here is more akin to a claim of unjust enrichment, which allows a court to imply a contract to prevent one from unjustly receiving and retaining an independent benefit. *Karaus v Bank of New York Mellon*, 300 Mich App 9, 23; 831 NW2d 897 (2012). But as this Court has explained:

> A third party is not unjustly enriched when it receives a benefit from a contract between two other parties, where the party benefited has not requested the benefit or misled the other parties. . . . Otherwise stated, the mere fact that a third person benefits from a contract between two other persons does not make such third person liable in quasi-contract, unjust enrichment, or restitution. [*Morris Pumps v Centerline Piping, Inc*, 273 Mich App 187, 196; 729 NW2d 898 (2006), quoting 66 Am Jur 2d, Restitution and Implied Contracts, §32, p 628.]

The mere fact that ACS discovered the embezzlement through Orlando's investigation does not make defendant liable for any part of her fee. Plaintiff contracted with Orlando to investigate defendant's businesses. As a result of this contract, ACS learned of the embezzlement that was occurring. Defendant did not request Orlando's assistance, nor did he mislead Orlando or plaintiff into providing him this benefit. Defendant may not be held liable for any portion of Orlando's fee as a matter of equity.

## C. PROPERTY DISTRIBUTION

Plaintiff raises several claims of error arising out of the trial court's property distribution. While most of her contentions are without merit, we agree that the trial court erred in some respects.

### 1. APPOINTMENT OF A RECEIVER

Plaintiff first contends that the trial court abused its discretion when it appointed a receiver to sell the marital home and certain personal property. We disagree. A trial court's decision to appoint a receiver is reviewed for an abuse of discretion. *Shouneyia v Shouneyia*, 291 Mich App 318, 325; 807 NW2d 48 (2011).

---

[5] Orlando is an expert witness plaintiff hired to further investigate the value of defendant's businesses.

As this Court has explained:

> A circuit court has broad jurisdiction to appoint a receiver in an appropriate case. MCL 600.601, 600.605, 600.611, and 600.2926; *Petitpren v Taylor School Dist*, 104 Mich App 283, 292-296; 304 NW2d 553 (1981). "Circuit court judges in the exercise of their equitable powers, may appoint receivers in all cases pending where appointment is allowed by law." MCL 600.2926. This statute has been interpreted as authorizing a circuit court to appoint a receiver when specifically allowed by statute and also when no specific statute applies but "the facts and circumstances render the appointment of a receiver an appropriate exercise of the circuit court's equitable jurisdiction." *Petitpren*, *supra* at 294. The purpose of appointing a receiver is to preserve property and to dispose of it under the order of the court. *Cohen v Cohen*, 125 Mich App 206, 214; 335 NW2d 661 (1983). In general, a receiver should only be appointed in extreme cases. *Petitpren*, *supra* at 295. But a party's past unimpressive performance may justify the trial court in appointing a receiver. *Francis Martin, Inc v Lomas*, 62 Mich App 706, 710-711; 233 NW2d 702 (1975). [*Reed v Reed*, 265 Mich App 131, 161-162; 693 NW2d 825 (2005).]

The trial court concluded that given the parties' volatility, they would not be able to work together to sell the home and dispose of the personal property without the assistance of a receiver. Indeed, it was abundantly clear throughout the lower court proceedings that plaintiff and defendant could not work together, particularly with regard to financial issues. Nor did the parties agree on whether the home should be sold; plaintiff wished to stay in the home until the parties' daughter graduated from high school, while defendant wished for the home to be sold immediately. Moreover, because defendant was ordered to continue to pay the mortgage, utilities, and other expenses related to the home until it was sold, plaintiff had little incentive to cooperate with the sale. She could continue to live in the home while defendant incurred substantial expenses so long as it remained unsold. Under the circumstances, we cannot conclude that the trial court's decision to appoint a receiver was an abuse of discretion.[6]

Plaintiff contends that the trial court's appointment of a receiver was procedurally improper because it was not requested through a motion, which she alleges denied her due process and the opportunity to address the issue. Plaintiff's contention that a receiver may be appointed only on motion by a party is flatly wrong. A trial court may appoint a receiver "[u]pon the motion of a party *or on its own initiative* . . . ." MCR 2.622(A). To the extent plaintiff claims she was denied the ability to contest the issue, the lower court record

---

[6] Plaintiff's conduct after the appointment of the receiver further proved why such an appointment was necessary. Plaintiff was uncooperative with efforts to sell the home, refusing to make it available for showings as required by the trial court. And once the home was under contract, she removed property from the home, causing damage, which delayed the sale and resulted in a reduction in the purchase price. Thus, the trial court's prediction that the parties would not be able to cooperate to sell the home proved very accurate.

demonstrates that she was afforded such an opportunity. Plaintiff was clearly on notice that the trial court was considering appointing a receiver, her counsel having discussed the issue with the trial court at the conclusion of the trial. And after the receiver was appointed, plaintiff contested the appointment in subsequently filed motions, which were addressed by the trial court. Plaintiff had ample opportunities to address the issue.

## 2. PAYMENT OF BUSINESS ASSETS

In the divorce judgment, plaintiff was awarded certain non-liquid assets. The trial court asked the parties to propose plans regarding how plaintiff would be paid for her share of these assets. It adopted defendant's proposal with regard to plaintiff's share of DRM Group and WRN, and crafted its own plan with respect to plaintiff's share of a Porsche retained by defendant, an account held with Fidelity, and SCM Fund I, another investment. We conclude that further proceedings are required with respect to this aspect of the trial court's property distribution.

A trial court has broad discretion when determining how to divide the marital estate in a divorce proceeding. *McDougal v McDougal*, 451 Mich 80, 88; 545 NW2d 357 (1996). As our Supreme Court has explained:

> [T]he appellate standard of review of dispositional rulings is not limited to clear error or to abuse of discretion. The appellate court must first review the trial court's findings of fact under the clearly erroneous standard. If the findings of fact are upheld, the appellate court must decide whether the dispositive ruling was fair and equitable in light of those facts. But because we recognize that the dispositional ruling is an exercise of discretion and that appellate courts are often reluctant to reverse such rulings, we hold that the ruling should be affirmed unless the appellate court is left with the firm conviction that the division was inequitable. [*Sparks v Sparks*, 440 Mich 141, 151-152; 485 NW2d 893 (1992).]

With regard to plaintiff's share of defendant's interests in DRM Group and WRN, defendant's proposal correctly followed the trial court's opinion and judgment by valuing plaintiff's share of these businesses at $578,500.[7] But he then reduced that amount by $160,000, representing the value placed on plaintiff's businesses pursuant to an agreement between the parties and an additional $80,000 plaintiff received in the same agreement. Nowhere in the trial court's opinion or the divorce judgment is it stated that plaintiff's share of the marital estate would be reduced by these amounts. There was simply no basis for defendant to reduce plaintiff's share of his businesses by $160,000, and the trial court erred by accepting this reduction.

The trial court also accepted defendant's proposed payment plan, which gave him until December 31, 2035, to pay off the amount he owed. Defendant provided no explanation why

---

[7] The trial court valued DRM Group at $1,090,000, and WRN at $67,000, and then awarded plaintiff half of these amounts.

such a lengthy term was necessary, and the trial court provided no explanation why it accepted this payment schedule. Certainly, because the assets are not liquid, some sort of payment plan is reasonable. See *Thomas v Thomas*, 176 Mich App 90; 439 NW2d 270 (1989) (ordering a six-year payment plan for the plaintiff's payment to the defendant for the value of the plaintiff's law degree). But the record contains no analysis that would explain why a 20-year payment schedule is fair or equitable. Under the circumstances, we remand the matter to the trial court. On remand, the trial court must reconsider the payment schedule it ordered with respect to plaintiff's share of DRM Group and WRN and provide an explanation of why the payment plan it adopts is fair and equitable. Such an explanation is necessary before this Court may undertake any meaningful review of the issue.

Plaintiff also takes issue with the trial court's payment plan regarding her share of the Porsche, the Fidelity account, and SCM Fund I, arguing that it was inappropriate to require her to provide defendant notice of any default on his part. However, it now appears that these assets have been accounted for as part of the distribution of the receivership estate. Thus, as it appears that the payment plan ordered by the trial court will not be followed, there is no need to address the propriety of this portion of the trial court's order.

## 3. SCENIC CAPITAL MANAGEMENT

Plaintiff contends that the trial court clearly erred by failing to value and award Scenic Capital Management (Scenic). We agree.

Scenic was described at trial as a business without a true business purpose. Rather, it was simply an entity, owned by defendant, that held bank accounts with Comerica.[8] Cherfoli testified at trial that these accounts were worth over $200,000. However, in an exhibit defendant prepared and attached to his proposed findings of fact and conclusions of law, defendant asserted that Scenic had no funds remaining "as a result of [d]efendant maintaining the status quo, including the most recent payment of the property taxes for the former marital home." In its opinion, the trial court stated that "based on the testimony, no funds are remaining in the Comerica/SCM account[,]"and failed to award Scenic to either party. The trial testimony, however, did not support the trial court's valuation of Scenic. Rather, the trial court appears to have adopted defendant's unsupported statement in his post-trial brief that Scenic's accounts had been entirely depleted. Because this finding lacks evidentiary support, it is clearly erroneous. *Augustine v Allstate Ins Co*, 292 Mich App 408, 424; 807 NW2d 77 (2011) (quotation and brackets omitted).

When plaintiff pointed out the trial court's failure to determine the value of this asset and make an appropriate award, the trial court rejected the argument, explaining that it had, in fact, awarded her half of the asset when it awarded her half the value of SCM Fund I. This was also clearly erroneous. SCM Fund I was an investment valued by the trial court at $30,000. Scenic

---

[8] Defendant described the accounts as savings accounts he established to save for the children's education.

was an entirely different asset. The trial court apparently confused the two. On remand, the trial court must determine the value of Scenic and then determine how it shall be divided.[9]

## 4. EMBEZZLED FUNDS

Plaintiff next argues that the trial court erred by failing to account for the potential recovery of the funds embezzled from ACS. We disagree.

Plaintiff argues that the trial court should have included in the divorce judgment a provision that would allow her to receive any increased value in defendant's share of DRM Group caused by the recovery of the embezzled funds, if that were to occur. This Court has explained that "assets earned by a spouse during the marriage are properly considered part of the marital estate. This is true whether the assets are received during the existence of the marriage or after the judgment of divorce." *Skelly v Skelly*, 286 Mich App 578, 583; 780 NW2d 368 (2009). Cherfoli explained that the embezzlement reduced his value of defendant's ownership stake in DRM Group by $175,000. Thus, one could infer that if the embezzled funds are recovered, DRM Group's value could increase. But any potential recovery of these assets cannot be considered an asset received during the existence of the marriage. Rather, in the unlikely event ACS is able to recover some or all of the embezzled funds, any corresponding increase in DRM Group's value would occur after the marriage ended.[10] Plaintiff is not entitled to an award based on future contingencies that may never come to pass.

## 5. DRM GROUP AND WRN

Plaintiff next contends that the trial court clearly erred in its valuations of DRM Group and WRN. We disagree.

The trial court accepted Cherfoli's values for these companies, each of which was lower than Orlando's determinations. Plaintiff first contends that the trial court erred by failing to follow an agreement reached by the parties to value DRM Group and WRN as of December 31, 2013. Plaintiff relies on cases holding that a trial court is bound by stipulations of fact made by the parties. See *Dana Corp v Appeal Bd of MESC*, 371 Mich 107, 110; 123 NW2d 277 (1963) (stipulated facts submitted "to any adjudicating forum" are "sacrosanct. Neither a hearing officer nor a judge may thereafter alter them."); *Gates v Gates*, 256 Mich App 420, 426; 664 NW2d 231 (2003) (stipulations of fact are binding, but stipulations of law are not). Plaintiff's argument is without merit, as there was no stipulation made before the trial court. Whatever agreement the

---

[9] We note that the trial court is not necessarily bound to value the asset as of the time of trial. "For purposes of dividing property, marital assets are typically valued at the time of trial or at the time judgment is entered . . . though the court may, in its discretion, use a different date." *Byington v Byington*, 224 Mich App 103, 114 n 4; 568 NW2d 141 (1997).

[10] Much the same, if DRM Group's value has increased since the dissolution of the marriage for other reasons, such as increased revenue or decreased costs, the trial court could not order plaintiff to receive some portion of this increased value.

parties reached privately never became a stipulation in the trial court. Further, no evidence was presented that would have allowed the trial court to value the businesses as of December 31, 2013. Rather, plaintiff, relying on her expert, Orlando, similarly asked the trial court to value the businesses after December 31, 2013.[11] By doing so, plaintiff waived any contention that the businesses should be valued as of December 31, 2013. See *Marshall Lasser, PC v George*, 252 Mich App 104, 109; 651 NW2d 158 (2002) ("A party is not allowed to assign as error on appeal something which his or her own counsel deemed proper at trial since do to so would permit the party to harbor error as an appellate parachute." (quotation omitted)).

Plaintiff next contends that the trial court should have rejected Cherfoli's valuations, and instead, accepted Orlando's. She claims that Cherfoli relied on speculation, while Orlando relied on past history of the companies. However, the projections made by Cherfoli were supported by his discussions with defendant and by defendant's trial testimony. The trial court found Cherfoli credible, and we decline to interfere with this credibility determination. *Berger*, 277 Mich App at 705.

## 6. FUTURE DMV DISTRIBUTIONS

Plaintiff contends that the trial court erred by failing to address future distributions defendant would receive after DMV ended its operations. The trial court did not address future distributions from DMV in its opinion. After plaintiff raised the issue in her motion for relief from judgment, the trial court explained only that it found Cherfoli's testimony on the subject credible, and that plaintiff seemed only to dispute the trial court's reliance on his opinion of DMV's value. The trial court did appear to misapprehend plaintiff's argument. Plaintiff contended that "it was error for the trial court to not make a determination as to how future distributions from [DMV] would be divided." However, defendant testified that he would not receive any future income from DMV. Plaintiff points to no evidence conflicting with defendant's testimony, we have found none.[12] Thus, although the trial court did not explicitly address this issue, we conclude that the trial court's failure to award future distributions was equitable, and thus, must be affirmed.

## 7. PNC DEBT

Plaintiff next contends that the trial court erred by failing to address a line of credit with PNC Bank. Plaintiff's proposed findings of fact and conclusions of law asked that defendant be ordered "to pay 70% of the joint PNC loan." The trial court's opinion and judgment of divorce

---

[11] Orlando explained that the only difference in her valuation of DRM Group was that she projected a higher revenue for ACS in 2014 than Cherfoli. Her valuation of WRN differed only in the amount of inventory she assumed, which was a projection of the company's then-current inventory. Thus, Orlando used much of the same information as Cherfoli, and to the extent their valuations differed, this difference was not because of a different valuation date.

[12] Cherfoli did testify that *if* any future distributions were received by defendant, those should be split with plaintiff. However, Cherfoli did not testify that he expected this to occur.

-14-

did not specifically mention the "joint PNC loan." However, the divorce judgment states that "Mikken Medical, valued at $80,000 is awarded to Plaintiff. Plaintiff shall assume all debts and liabilities attached to that business entity." After reviewing the record, we are unable to determine whether this line of credit is encompassed within the debts of Mikken Medical. Thus, on remand, we direct the trial court to specify with particularity who shall be responsible for the line of credit held at PNC Bank.

Further, the trial court has not clearly stated who will receive Mikken Enterprises. Plaintiff asked the trial court to clarify this point in her motion for clarification. The trial court responded by stating that "Mikken" would be awarded to Plaintiff. In the judgment of divorce, the trial court echoed its original opinion, stating that Plaintiff would receive Mikken Medical, but saying nothing regarding Mikken Enterprises. "[I]t is settled law that trial courts are required by court rule to include a determination of the property rights of the parties in the judgment of divorce." *Olson*, 256 Mich App at 627. See also MCR 3.211(B). On remand, the trial court must specifically state its disposition of Mikken Enterprises.

## 8. AMERICAN EXPRESS CHARGES

Finally, plaintiff contends that the trial court erred when it reduced her share of the marital estate by over $16,000, representing charges plaintiff made to the American Express card that exceeded her monthly allowance under the status quo order. Defendant filed a motion regarding these charges, but provided no supporting documentation. The trial court noted this fact in its opinion regarding the motion. It explained that it allowed defendant to provide the bills for *in camera* inspection, and then stated its findings. The trial court did not hold a hearing on the matter. Thus, plaintiff was deprived of any meaningful opportunity to review the evidence or contest the trial court's decision after it reviewed the bills. Under the circumstances, we vacate this portion of the trial court's opinion and order entered on March 23, 2015, and remand the matter for further proceedings. Due process requires that at a minimum, plaintiff have the opportunity to know and respond to the evidence. *Hinky Dinky Supermarket, Inc v Dep't of Community Health*, 261 Mich App 604, 606; 682 NW2d 759 (2004). On remand, plaintiff must receive an opportunity to view the evidence and respond.

## II. DOCKET NO. 331699

In Docket No. 331699, plaintiff challenges an order that found her in contempt of court and sentenced her to serve 40 days in jail. We agree that the trial court erred in this regard.

Ordinarily, a trial court's issuance of a contempt order is reviewed for an abuse of discretion. *In re Moroun*, 295 Mich App 312, 335; 814 NW2d 319 (2012). Issues of law related to the contempt decision are reviewed de novo. *Id*. at 336. "The interpretation and application of court rules and statutes are also reviewed de novo." *Id*. A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *Lewis v LeGrow*, 258 Mich App 175, 200; 670 NW2d 675 (2003). However, with the exception of an evidentiary challenge, plaintiff's claims were not raised in the trial court. Plaintiff's unpreserved claims of error are reviewed for plain error affecting substantial rights. *In re Contempt of Henry*, 282 Mich App 656, 666; 765 NW2d 44 (2009). To be entitled to relief, plaintiff must demonstrate that an error occurred, that the error was plain, and that the error affected her substantial rights. *Id*.

After the receiver found a willing buyer for the home, plaintiff asked that she be allowed to retain a chandelier. The trial court rejected the request. Plaintiff, however, removed the chandelier and claims to have sold it. Upon motion from the receiver, and after conducting a hearing, the trial court found plaintiff in civil contempt, and ordered her to serve 40 days in jail.

Plaintiff argues that the trial court's contempt order improperly caused her to be imprisoned because it did not state conditions that would allow her to obtain her release. "Confinement or imprisonment may be imposed whether the contempt is civil or criminal or nature." *Moroun*, 295 Mich App at 336. However, "[i]n the civil context, the confinement must be conditional." *Id*. See also MCL 600.1715. "Civil contempt imposes a term of imprisonment that ceases when the contemnor complies with the court's order or when it is no longer within his or her power to comply." *Id*. Thus, "[b]ecause the purpose of civil contempt is to enforce compliance with an order, rather than to punish for disobedience, the contemnor may not be incarcerated beyond the time that he or she is able to comply with the court's order." *Id*. at 339.

In *Moroun*, this Court determined that it could not uphold an order holding the appellants in that case in contempt and ordering them to jail "because [the order] failed to identify 'the act or duty' that must be performed before the incarceration may be terminated." *Id*. at 340, citing MCL 600.1715(2). Much the same, in this case, the trial court ordered plaintiff to serve 40 days in jail without identifying any particular act or duty that she was required to perform to obtain her own release. This was an abuse of the trial court's discretion. It was also a plain error that affected plaintiff's substantial rights. *Moroun* makes clear what must be contained within the order. And as a result of the plain error, plaintiff was incarcerated without the option of obtaining her release by purging her civil contempt.

The receiver urges us to follow the remedy stated in *Moroun*, where this Court "vacate[d] that portion of the trial court's commitment order that continues incarceration . . . and remand[ed] the case to the trial court. On remand, the trial court [was required to] craft an order stating with particularity what act or duty appellants must perform . . . to enable them to purge themselves of the contempt finding . . . ." *Moroun*, 295 Mich App at 318. Under other circumstances, this might be the appropriate remedy. However, here, it is clear that plaintiff can no longer perform the act that would be required to purge the contempt – i.e., replace the chandelier. The home has been sold, and the buyer given a credit at closing for the value of the missing chandelier. Plaintiff no longer has the power to perform the duty that would be required of her. Accordingly, she can no longer, as a civil contempt sanction, be held in jail. *Moroun*, 295 Mich App at 336-337. See also MCL 600.1715(2) ("[T]he imprisonment shall be terminated when the person performs the act or duty or no longer has the power to perform the act or duty, which shall be specified in the order of commitment . . . ."). Thus, we vacate the trial court's contempt order to the extent it requires plaintiff to serve a jail sentence.[13]

---

[13] This should not be read as condoning plaintiff's conduct in any way. Plaintiff's request to remove the chandelier was denied by the trial court, and she was informed on several subsequent occasions that she could not remove the chandelier. Despite being a licensed attorney, plaintiff ignored the trial court's directives and removed the chandelier, the final straw in a string of

Given that plaintiff is not subject to further incarceration, we decline to address the remaining arguments raised by plaintiff, as these issues are now moot.

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Each having prevailed in part, the parties may not tax costs under MCR 7.219.

/s/ Kurtis T. Wilder
/s/ William B. Murphy
/s/ Peter D. O'Connell

---

actions she took that interfered with the sale of the home. The trial court's desire to punish plaintiff for her blatant disregard of the trial court's orders is certainly understandable. However, it is criminal contempt, not civil contempt, that allows a trial court to punish, rather than coerce. *Porter v Porter*, 285 Mich App 450, 455; 776 NW2d 377 (2009).