*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

COLLEEN MARIE STEARNS,

        Plaintiff-Appellant,

v

MARVIN DUANE STEARNS,

        Defendant-Appellee.

UNPUBLISHED
May 18, 2023

No. 360633
Genesee Circuit Court
LC No. 18-327142-DO

Before: CAMERON, P.J., and K. F. KELLY and M. J. KELLY, JJ.

PER CURIAM.

In this divorce action, plaintiff, Colleen Stearns, appeals as of right the trial court's judgment of divorce. Because there are no errors warranting reversal, we affirm.

## I. BASIC FACTS

In 1987, Colleen married defendant, Marvin Stearns. They divorced in 1990, and claim to not have had any contact with each other until December 24, 2009. At that time, Colleen was ending a long-term relationship with her then-boyfriend, and Marvin was in the process of divorcing another woman. The parties started dating, and, by January 2010, they were looking for houses together. In March 2010, Colleen purchased a house on Lake Fenton on a land contract in her name only. Although Colleen paid the entirety of the $62,000 down payment, she could only do so by borrowing $15,000 from Marvin (who had borrowed the money from his mother). The parties moved in together, and they married for a second time in November 2015.

The house eventually became a point of contention between the parties. However, in the beginning the parties worked together to improve the house. Colleen acknowledged that Marvin paid $300 per week[1] toward the house's expenses, that he contributed labor to renovating the

---

[1] Colleen testified that the $300 per week was for rent, and she introduced into evidence carbon copies of checks Marvin had made out to her that included the notation "rent" in the memo line. Marvin, however, denied ever paying rent, and he testified that the word "rent" was not written in

house, and that he borrowed money from his 401(k) to help finance the repairs and renovations. Colleen also borrowed from her 401(k) to make improvements. Colleen estimated that they put approximately $80,000 worth of labor and materials into the house from the time it was purchased until the parties eventually separated. Likewise, Marvin testified that he had put numerous hours of physical labor into the house and had contributed financially. While the parties were still dating, they opened a joint account for the house's expenses. They both contributed equally to that account. Marvin testified that they had purchased the house with the intent that it would be both of theirs and that they would sell it when they retired. He explained that the reason his name had not been included on the land contract—or on the mortgage when Colleen refinanced—was because he had filed for bankruptcy around the same time that they were planning the purchase of the house. Colleen, however, testified that Marvin had no interest in the house. She explained that she had purchased the house alone, that the house was her equity to retire, and that Marvin knew that he would never be included on the deed.

In December 2018, Colleen filed for divorce. The parties relationship deteriorated rapidly. She asserted that when he found out she was planning to divorce him, he followed her around the house yelling at her. In response, she called 911, and Marvin was asked to leave the house. Marvin later accused Colleen of stealing items of personal property, and Colleen accused him of stealing jewelry and money from her. Marvin stated that all of his financial documents went missing after he was served with the divorce papers. Colleen testified that, while she was away from the house, Marvin and several other people entered the house and took a 75-inch TV and surround sound system in violation of the court's status quo order. She reported the theft to the police, but nothing came of it. Marvin countered that the TV had been financed in his name and that the police had allowed him to take it. Colleen accused Marvin of stealing approximately $40,000 worth of personal property from their across-the-street garage, and she added that he had changed the code on the key pad and locked the door so that she could not access the garage. She stated that when she tried to gain entry using a screwdriver, he came and twisted her arm until she fell to the ground. Colleen did not call the police. At some point, however, Colleen damaged Marvin's computer after finding a file of "women" on it. When Marvin demanded his computer, she told him that she did not have it. He called the police. Colleen decided to stay in the bedroom, and when the police entered the room to speak to her they found a loaded gun. Colleen was taken from the room, but not arrested. At some point, Marvin accused Colleen of hitting him and she had to leave the house for the night. On another occasion, he kicked open a door when he was trying to retrieve personal items from a locked door. He damaged the door, the wall, and the doorframe in the process. The police were present at that time, but did not arrest him. Colleen also threw out some of his clothing because—despite knowing that she suffered from a lung disease—he had smoked in the clothing and then left it where it would exacerbate her cough. Colleen also hid the key to the gun cabinet, installed a security camera because of his "comings and goings" from the house, and locked an upstairs room in a manner that prevented him from getting his personal property.

As matters escalated between the parties, Colleen sought and received a personal protection order (PPO). Her lawyer filed a motion for exclusive possession of the marital house, asserting

---

his handwriting. The trial court found that the payments were not rent, and Colleen has not challenged that finding on appeal.

that because of the deteriorating situation and the lack of aid from local police, Colleen was fearful she would be harmed by Marvin. Before the motion was heard, Marvin moved out of the house because he was concerned that he would be arrested if Colleen alleged that he was threatening her. Despite the fact that she sought exclusive possession of the house, had obtained a PPO against Marvin, had installed a security camera because of his "comings and goings," and had repeatedly called the police on him, Colleen testified at trial that Marvin had left voluntarily. Marvin, on the other hand, believed that he had been effectively evicted by her actions.

Colleen testified that the breakdown in the marriage was Marvin's fault. At trial, she testified that 37-days into the marriage, she knew it was over. She decided to keep her head down and search for evidence. She testified that she found that he was lying, stealing, cheating, and engaging with prostitutes. Yet, she admitted that, although she was frequently told that Marvin was cheating on her, she never caught him in an affair. Further, she testified that he stole approximately $68,000 from their joint account to gamble at casinos and stay in hotels in which she never stayed. She also asserted that he withdrew cash, including $8,500. She sated that he taunted her after withdrawing the $8,500 by telling her that he was going to use Colleen's money to take his twenty-eight-year old girlfriend to a casino, dinner, and then a hotel room for sex. Marvin denied stealing from the joint account. He stated that they went to the hotels and casinos together and that the cash he withdrew was partially to pay him the money he had earned "flipping" a house during the marriage. He claimed that he did not cheat on Colleen and did not have a twenty-eight-year old girlfriend, and he denied engaging prostitutes.

At trial, both parties testified as to the other's misconduct during the divorce proceedings. In brief, Marvin testified that Colleen threw out between 500 and 1,000 collectible sports cards. He also asserted that she placed some of his personal property on a pallet outside the garage and then spent months refusing to allow him to pick it up. When he eventually picked it up, the property was moldy and damaged by the elements. Further, he was unable to take it all, and Colleen threw the remainder out before they could agree on a time for him to return to pick the rest up. Colleen, on the other hand, confronted Marvin with a series of text messages that he sent to her suggesting that his mother was paying his legal fees, so he could afford for the proceedings to be dragged out, whereas Colleen was going to be "bled dry" by her own lawyer. Marvin admitted that he made the comments because he was trying to get "underneath" Colleen's skin.

Initially, the parties main dispute concerned the premarital equity in the Lake Fenton house. After two days of trial on the matter, the court determined that Marvin was entitled to an equal share of the equity in the house, and the court ordered that the equity should be calculated from the date the house was acquired in March 2010 until Marvin vacated the house in January 2019. Thereafter, the parties turned their attention to determining the value of the house. Colleen obtained an appraisal valuing the house at $650,000. Marvin acquired two appraisals. The first resulted in the property being appraised at $700,000 or $710,000. The second resulted in the property being appraised at $920,000. Marvin testified that he did not "shop around" to try and get a higher appraisal. Instead, he got the second one because he did not feel like the first one was realistic since the house had been previously appraised at $760,000 and that they had put thousands of dollars of repairs into the house after that appraisal.

In July 2020, Marvin filed a motion for the marital house to be immediately listed for sale. He alleged that there were two unsuccessful mediation attempts and an unsuccessful 4-way

settlement conference. He explained that the "issue at the heart of this case not getting settled is the fair market value of the marital home." Following argument on the motion, the court ordered the house to be listed for sale. Later, the court ordered that the seller's disclosure statement be revised so as to remove "any mention of Court proceedings." The court also ordered "removal of the provision that Seller is to be present for showings, removal of the provision 'No monies owed if purchased by seller,' and no provisions requiring proof of financing prior to showings." Subsequently, Marvin moved for the appointment of a receiver, alleging that a receiver was necessary because Colleen was attempting to thwart the receipt of purchase offers on the house. In response, Colleen denied any wrongdoing, and asserted that the lack of offers was because the house was listed for more than its fair market value.

Colleen testified that she did not want to sell the house. She explained that she wanted to continue to build equity in the house. However, because of the court order to list the house for sale, she signed a listing agreement with John Tremaine. She did not renew the listing agreement when it expired.

At trial, in addition to the conditions that the court ordered to be removed from the seller's disclosure statement, Marvin presented evidence that Colleen had taken other steps to hinder realistic purchase offers. Two realtors testified that it was extremely difficult to schedule a showing of the house. They had to try over and over again, which was not something that would commonly occur. Because of the extreme difficulty in scheduling the showing, they reached out to the listing agent. After that, a showing was scheduled. Upon arrival, however, the door was locked. A realtor knocked on the door; a woman inside looked at her and then went upstairs and did not open the door. When the realtors finally were able to show the house, there were divorce papers pinned to the walls, the trim in the master bedroom had been removed, there was a sink on the floor, and the master bathroom was in disarray. One of the realtors testified that it felt like the seller did not want to sell. The court also admitted documentary evidence that listed showing requests for the property. The record showed that Colleen had declined several showings, including on showing in November because it was the "seller's birthday." Marvin believed that was a lie because Colleen's birthday was in September. Marvin also testified that Colleen had refused to allow a "for sale" sign to be placed on the property. Finally, he noted that she had excluded the lakeside house's dock, dock pump, and tiki bar from the sale, and that she had also excluded the lot that their across-the-street garage was located upon. He thought that if those items were included, the offer prices for the house would be higher.

Relevant to the issues raised on appeal, the court found that the parties were equally at fault for the breakdown of the marriage, and it found that Colleen had intentionally hindered the sale of the house after the court ordered that it be listed so it could receive a realistic determination of the house's value. The trial court appointed a receiver for the marital house and ordered that it be sold. The court held that the value of the house would be determined by the sales price and that the parties would have an equal share of the equity. The court awarded Colleen a $31,000 offset for her proportional share of the $62,000 down payment on the house, but declined to award an offset for her maintenance of the house following the parties' separation because both parties had to pay their own living expenses during that time. The court also directed that the parties' would equally split the value that had accrued in their retirement accounts between the date of the marriage and the date that the judgment of divorce was entered.

-4-

This appeal follows.

## II. PROPERTY DISTRIBUTION

## A. STANDARD OF REVIEW

In reviewing a property distribution in a divorce case, the Court "must first review the trial court's findings of fact" for clear error. *Sparks v Sparks*, 440 Mich 141, 151; 485 NW2d 893 (1992). "If the findings of fact are upheld, the appellate court must decide whether the dispositive ruling was fair and equitable in light of those facts." *Id*. at 151-152. "But because we recognize that the dispositional ruling is an exercise of discretion and that appellate courts are often reluctant to reverse such rulings, we hold that the ruling should be affirmed unless the appellate court is left with the firm conviction that the division was inequitable." *Id*. at 152 (footnote omitted).

## B. ANALYSIS

Colleen's arguments on appeal fall into two categories: challenges related to the distribution of the marital home and challenges related to the distribution of her retirement accounts.[2] We address the latter first.

## 1. RETIREMENT ACCOUNTS

The court awarded Marvin 50% of the marital coverture of Colleen's 401(k), and it awarded him 50% of the amount that accrued between November 23, 2015 and January 25, 2022 in Colleen's American Fund account and in her two IRA accounts.

Colleen argues that the court erred by treating the IRA accounts and the American Trust account as part of the marital estate. She asserts that the accounts were funded using money she received as part of her inheritance from her parents and grandparents. In support of that allegation, she directs this Court only to her May 29, 2019 trial brief. The trial brief, however, only states that Colleen had "approximately $47,728 which she inherited from her parents and grandmother." Colleen never presented any testimony or documentary evidence in support of that factual assertion. Collen also argues that Marvin did not make any significant contribution to those accounts during the marriage. Again, however, she points to no testimony or documentary evidence supporting that claim. Indeed, Colleen merely testified regarding the value of the 401(k) account; she did not testify regarding her IRA accounts or the American Fund account. Instead, on cross examination of Marvin, Colleen's lawyer asked him if he was aware that the IRAs were Colleen's "inheritances from—that were from prior to the marriage." He stated only that he was aware of a different asset that was Colleen's inheritance from before the marriage. By failing to provide factual support for her assertions, Colleen has abandoned her claim that the IRA accounts and the American Fund account are separate property that should not have been divided as part of the marital estate. See *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959) ("It is not

---

[2] Although she phrases her argument as relating to all marital assets except the marital home, careful review of the record reflects that she is only challenging the court's decision as to the house and as to her retirement accounts.

enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position.").

Furthermore, by failing to even raise this issue before the trial court, Colleen has waived review of it on appeal. In civil cases, generally, a party waives review of an issue that the party did not timely raise in the trial court. *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008). As explained in *Walters*:

> The principal rationale for the [raise-or-waive] rule is based in the nature of the adversarial process and judicial efficiency. By limiting appellate review to those issues raised and argued in the trial court, and holding all other issues waived, appellate courts require litigants to raise and frame their arguments at a time when their opponents may respond to them factually. This practice also avoids the untenable result of permitting an unsuccessful litigant to prevail by avoiding its tactical decisions that proved unsuccessful. Generally, a party may not remain silent in the trial court, only to prevail on an issue that was not called to the trial court's attention. Trial courts are not the research assistants of the litigants; the parties have a duty to fully present their legal arguments to the court for its resolution of their dispute. [*Id*. at 388 (citations omitted).]

Here, following the presentation of proofs, the trial court directed the parties to prepare written closing arguments. The court specifically directed that the arguments with respect to the house should "be distinct and separate from what you may be asking about retirement accounts or anything else" Thereafter, in his written closing argument, Colleen's lawyer suggested that, after considering that Marvin was "twice as fault worthy as" Colleen, the court should only award Marvin a 25% share in Colleen's "non inheritance" 401k account. He did not argue that Colleen's IRA accounts and American Fund account were separate, non-marital property. Because Colleen did not raise any challenge in the trial court with regard to whether the IRA accounts and the American Fund account were separate property, she has waived review of it on appeal. See *Walters*, 481 Mich at 387. See also *Lewis v LeGrow*, 258 Mich App 175, 210; 670 NW2d 675 (2003) ("It is settled that error requiring reversal may only be predicted on the trial court's actions and not upon alleged error to which the aggrieved party contributed by plan or negligence.").

Next, Colleen argues that in dividing all of her retirement accounts as part of the marital estate, the trial court erred because it only considered the *Sparks* factors in relation to its decision to distribute the marital home. "The goal behind dividing marital property is to reach an equitable distribution in light of all the circumstances." *Washington v Washington*, 283 Mich App 667, 673; 770 NW2d 908 (2009). As a result, "[a]lthough marital property need not be divided equally, it must be divided equitably in light of a court's evaluation of the parties' contributions, faults and needs." *Richards v Richards*, 310 Mich App 683, 694; 874 NW2d 704 (2015). When dividing marital property, the trial court must consider the following factors when relevant to the circumstances of a particular case:

> (1) duration of the marriage, (2) contributions of the parties to the marital estate, (3) age of the parties, (4) health of the parties, (5) life status of the parties, (6) necessities and circumstances of the parties, (7) earning abilities of the parties, (8)

past relations and conduct of the parties, and (9) general principles of equity. [*Sparks*, 440 Mich at 159-160.]

There is no "rigid framework" for applying the factors relevant to the distribution of marital assets at the time of the divorce. *McDougal v McDougal*, 451 Mich 80, 88; 545 NW2d 357 (1996) (quotation marks and citations omitted).

Here, contrary to Colleen's argument on appeal, the court made findings on one of the *Sparks* factors. Specifically, the court addressed fault, i.e., the "past relations and conduct of the parties." See *Sparks*, 440 Mich at 160. The court explained:

The Court is, first of all, going to address the matter of fault. With respect to the breakdown in the marriage, the Court is not going to make a finding either party was responsible for more fault or less fault. The Court is satisfied that Michigan is a no-fault State, would allow the Court to make decisions wherein the, uh, estate— marital estate is divided equally.

Later, the court added that it was "more than satisfied" that the breakdown was caused by both parties. That finding was not clearly erroneous.

In brief, both parties filed police reports accusing the other of stealing personal property, and both parties called the police to the house multiple times between December 2018 and January 2019. Marvin testified that he was effectively evicted from the house by Colleen in January 2019. In particular, he stated he was afraid that she was going to use the PPO to get him arrested. Colleen, on the other hand, stated that she did not make him leave. Her claim, however, was belied by other actions she took, including obtaining a PPO against him, hiding the key to the gun safe, telling him that he could not have the house appraised because she was the homeowner, installing security cameras in response to his "coming and going" from the house, locking doors inside the house in a manner that prevented him from getting his personal property, and filing a motion for exclusive use of the house with the trial court. Moreover, Colleen testified that Marvin engaged prostitutes, stole money from their joint account, cheated on her, and physically and emotionally abused her. Marvin denied her allegations, but he later admitted to sending her text messages to get "underneath her skin." Colleen damaged Marvin's computer, threw out some of his clothing, and stored more of his property outside where it would be exposed to the elements. She justified damaging his computer by asserting that she had found a hidden file full of women. She justified throwing out his clothing by pointing out that he had left the smoke-scented clothing in an area so as to exacerbate her health issues. Marvin stated that Colleen threw out 500 to 1,000 collectible sports cards; Colleen denied doing so. In light of the extensive record showing that both parties were hostile toward one another and that they both frequently accused the other of misconduct, we are not left with a definite and firm conviction that the trial court erred by finding the parties equally at fault for the breakdown in the marriage.

Admittedly, the court did not address any of the remaining *Sparks* factors in connection with the distribution of the retirement accounts. However, the court was only required to address the relevant factors. See *Sparks*, 440 Mich at 159. In the proceedings below—excepting her arguments related to the marital home—Colleen did not argue that any factor other than fault was relevant to the distribution of the marital estate. Given that the court appears to have addressed

the only relevant *Sparks* factor, and given that the court's findings on that factor are not clearly erroneous, we conclude that there is no merit to Colleen's assertion that the court failed to adequately address the *Sparks* factors when distributing the parties' retirement accounts.

On this record, we conclude that the trial court's decision to award Marvin 50% of the marital coverture of Colleen's 401(k) and 50% of the value that accrued on the IRA accounts and the American Fund account during the marriage was fair and equitable.

## 2. MARITAL HOME

Collen asserts that the trial court abused its discretion by awarding Marvin 50% of the equity in the marital home. In support, she only contends that the trial court should have found that Marvin was responsible for the breakdown in the marriage. She alleges on appeal that he cheated on her from the beginning of the marriage; at trial, however, she admitted that she only had suspicions that he was cheating and that she had never caught him in an affair. She alleges that he paid women online for sexual favors; Marvin, however, denied that allegation. She alleges that he stole money from their joint bank account and booked rooms at hotels in which she never stayed; Marvin denied those allegations, stating that she stayed at the hotels with him. She also alleges that Marvin gambled away thousands of dollars of their money. The trial court did not find her allegations credible. Colleen also testified at length regarding Marvin's conduct in December 2018 and January 2019, which she asserts included physical abuse, emotional abuse, and theft and destruction of personal property. We conclude that Colleen's arguments amount to a claim that the trial court should have credited her testimony or Marvin's testimony. This Court, however, defers to the trial court's credibility determinations. *Richards*, 310 Mich App at 694; see also MCR 2.613(C). Here, for the reasons stated above, the trial court's finding that the parties were equally at fault is not clearly erroneous. Further, the court's determination that the property should be split equally is fair and equitable.

Colleen next argues that the trial court abused its discretion by not awarding her $62,000 as an offset for her down payment on the house. Rather, the court only allowed her a $31,000 offset. She does not offer any explanation for why that decision was erroneous. We conclude that, given that the court decided that the parties were entitled to an equal share of the equity in the house, the court's decision to award her only a $31,000 offset is fair and equitable.

Colleen also asserts that it was inequitable to value Marvin's 50% share of the equity in the marital home using the 2022 sales price instead of valuing the house in January 2019 when Marvin moved out of the marital home. In support, she argues that the trial court only ordered the house *listed* for sale, not that it actually be sold. Accordingly, she contends that the court's determination that she intentionally hindered the sale of the property is illogical. She argues that the court should have used the appraisals submitted by the parties to value the property.

"The trial determination of the proper time for the valuation of an assert is in the trial court's discretion." *Woodington v Shokoohi*, 288 Mich App 352, 355; 792 NW2d 63 (2010). "For the purposes of dividing property, marital assets are typically valued at the time of trial or the time judgment is entered, although a court may, in its discretion, use a different date." *Id.* at 365. In this case, the parties' appraisals ranged from $650,000 to $920,000. Both parties hotly contested the validity of the other party's calculation of the house value. The court's decision to order that

the property be listed for sale and for a purchase offer to be used to indicate the property's fair market value, therefore, was not unwarranted. Rather, as explained by the trial court in its ruling, the purpose was to "receive an appropriate offer and go step-by-step" from there.

Following the trial, the court held that the value of the house was to be the sales price and that it was not going to rely on an appraisal. The court found that Colleen intentionally hindered the sale. The court specifically found that she had posted court documents in the house and had declined to have a 'for sign' posted in the yard. Those findings were supported by the testimony from Marvin and from the real estate agents. Moreover, the court had earlier found that Colleen "imposed conditions on the listing agreement that made it near impossible to get realistic offers." The court had to order that the seller's disclosure statement be amended to remove several of the unrealistic requirements. The court's findings were further supported by the testimony from the real estate agents that testified that it was extremely difficult to obtain a showing for the property, that the house was listed in good condition but that the trim was removed in the bedroom, there was a sink on the floor, and the master bathroom was in disarray. In light of the record in this case, the trial court did not clearly err by finding that Colleen intentionally hindered potential buyers from making reality offers on the house.

Nevertheless, Colleen argues that her actions did not prevent offers from being made on the house. Instead, she asserts that the reason for the lack of offers was because the list price was too high. Tremaine's testimony supports her assertion. However, the court was not required to credit that testimony. Colleen also contends that after Tremaine suggested the list price be lowered, they received an offer for $725,000 minus $15,000 in closing costs. Colleen contends that she agreed that $710,000 could be used as the properties current fair market value, but Marvin rejected the offer because he thought the house was "worth way more." The record, however, contradicts her apparent willingness to settle. On the record, Colleen's lawyer stated that "[n]either of the parties wants to accept [the $710,000 offer] for different reasons." Further, although Colleen asserts that Marvin dragged out the proceedings, the trial court's finding that she was, in fact, the reason for the delay was not clearly erroneous. As a result, Marvin's alleged fault for the delay is not a basis for reversing the court's determination.

Finally, Colleen argues that she should have received an offset for the costs of maintaining the marital home after the parties' separation. The trial court declined to award an offset because it found that both parties had to pay their own living expenses during that period. Colleen did not proffer any evidence showing the costs associated with maintaining the house after Marvin left. Further, there is nothing in the record indicating the amount that Marvin spent on living expenses for that same period. Consequentially, although Colleen now contends that the decision not to allow an offset was inequitable because she had to pay more, she had not presented any factual support for that assertion.

Affirmed. Marvin may tax costs as the prevailing party. MCR 7.219(A).

/s/ Thomas C. Cameron
/s/ Kirsten Frank Kelly
/s/ Michael J. Kelly

-9-