McDOUGAL v McDOUGAL

Docket No. 98140. Argued November 7, 1995 (Calendar No. 1). Decided
April 2, 1996.

Janet A. McDougal and John A. McDougal were divorced in the
Wayne Circuit Court. The court, Kathleen MacDonald, J., found that
the fault for the breakdown of the marriage lay with Mr. McDougal
and divided the marital assets by awarding approximately what
each party had brought to the marriage, along with the personal
property that each party owned at the time of trial. It further
awarded Ms. McDougal $1.7 million as half the gross income from
certain patents held by Mr. McDougal, a one-third interest in the
patents themselves, and one-third of any future income derived
from the patents. The Court of Appeals, WEAVER, P.J., and MURPHY
and JANSEN, JJ., affirmed in an unpublished memorandum opinion
(Docket No. 141878). Mary Ann McDougal, as personal representa-
tive of the estate of John A. McDougal, deceased, appeals.

In an opinion per curiam, signed by Chief Justice BRICKLEY, and
Justices CAVANAGH, BOYLE, RILEY, and MALLETT, the Supreme Court
*held*:

Fault is an element to be considered in the search for an equita-
ble division of marital property; it is not a basis for punitive inequi-
table division. In this case, the element of fault does not support
the extreme financial penalties imposed by the circuit court, requir-
ing reversal and remand to the circuit court for further
proceedings.

Justice LEVIN concurred only in the result.

Reversed and remanded.

Justice WEAVER took no part in the decision of this case.

*Moceri, Hoste & Bejin* (by *Thomas H. Bejin*) (*Jer-
ald R. Lovell,* of counsel) for the plaintiff.

*Butzel, Long* (by *Frederick G. Buesser III*) for the
defendant.

PER CURIAM. This is a divorce case in which the parties
contest the manner in which the circuit court divided

the property, including assets relating to several patents. The Court of Appeals affirmed. We reverse the judgment of the Court of Appeals, and remand the case to the circuit court for further proceedings.

I

Janet A. McDougal and John A. McDougal were married in July 1982. It was the third marriage for each. Ms. McDougal, 38, was childless. Mr. McDougal, 60, had three adult children from his first marriage.

Ms. McDougal holds a Ph.D. degree. She has taught at several colleges and universities. At the time of trial, she was on the faculty of Cass Technical High School in Detroit. Her salary was approximately $46,000 per year.

Mr. McDougal was an engineer, who had retired from General Motors Corporation. At the time of the marriage, he was drawing a pension and receiving income from some investments. In retirement, he worked as a private inventor.

One of Mr. McDougal's inventions was a "spark advance control system" that reduced engine "knock" and improved automotive fuel efficiency. The spark advance control system was invented by Mr. McDougal years before the marriage, and he initially applied for a patent in February 1973. The invention was protected by two principal patents, one issued in 1975, the other in 1978.[1]

---

[1] The life of a patent is seventeen years. 35 USC 154. A related patent can be issued as a "division," 35 USC 121, or as a "continuation," *Sarkisian v Winn-Proof Corp*, 697 F2d 1313, 1323, n 23 (CA 9, 1983). However, it has often been said that "any attempted reservation or continuation in the patentee or those claiming under him of the patent monopoly, after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws." *Scott Paper Co v Marcalus*

Before these parties married in 1982, Mr. McDougal unsuccessfully marketed his invention to the automobile manufacturing companies. None purchased a license. In 1984, he learned that several auto manufacturers were using his invention without permission.

At that point, Mr. McDougal sought to enforce his patents. Following a great deal of negotiations and some litigation, he eventually entered into agreements with several manufacturers. As a result, approximately $3.4 million was received as income from the inventions during the marriage.

Obviously, Ms. McDougal contributed nothing to the invention of the spark advance control system by Mr. McDougal before they married, or to the procurement of the two principal patents. However, patented inventions are sometimes analogized to lottery tickets in the days before a drawing, or to unpublished novels—they have *potential* value, but little or no actual monetary worth. Thus, it is significant that Ms. McDougal made vital contributions to the enforcement efforts that resulted in significant income. She assumed almost total responsibility for managing the household, freeing Mr. McDougal to focus nearly exclusively on enforcement of his patent rights. Further, she assisted in the preparation of many of his written submissions.

As the years passed, the relationship between Ms. McDougal and Mr. McDougal deteriorated, and neither treated the other properly. As one would

*Mfg Co*, 326 US 249, 256; 66 S Ct 101; 90 L Ed 47 (1945). Several related patents were issued during the marriage. In total, Mr. McDougal held seventeen patents, though only six concerned the spark advance control system. The other eleven produced no revenue before or during the marriage.

expect, the parties disagree as to which actions were cause, and which were effect. Eventually, Ms. McDougal filed a March 1990 complaint for divorce.

The case was tried a year later. The testimony of the parties[2] persuaded the circuit court that fault for the breakdown of the marriage lay with Mr. McDougal. The court focused on his having broken a promise that he would attempt to have children with Ms. McDougal, his unilateral decision that the parties would begin filing separate tax returns, a September 1989 assault upon Ms. McDougal, and an unsuccessful attempt to divert toward his daughter some patent-related earnings that were received after the complaint was filed.

Dividing the assets, the circuit court sought to give Ms. McDougal and Mr. McDougal approximately what each had brought to the marriage in 1982, along with the personal property that belonged to each at the time of trial. There is no significant dispute with those aspects of the circuit court's ruling.

The main issue at trial, and the issue that continues to be disputed on appeal, relates to the proper allocation of the patents and the income received by the parties during the marriage. In light of its determination that the fault lay with Mr. McDougal, the court awarded Ms. McDougal $1.7 million as half the *gross* income from the patents, a one-third interest in the patents themselves, and one-third of any future income from the patents. The judgment thus included these provisions:

---

[2] Four witnesses testified—the parties and two patent experts.

It is further ordered and adjudged that plaintiff, Janet A. McDougal is awarded an amount equal to one-half (½) of the proceeds of the patents, patent applications, and licensing agreements hereinafter described[3] which were received during the marriage, a minimum of one million two hundred thousand ($1,200,000.00) Dollars. The Court has determined that . . . the proceeds of the patents during the marriage is three million four hundred forty thousand six hundred thirteen and 30/100 ($3,440,613.30) Dollars, and as a result thereof, the Plaintiff is awarded the sum of one million seven hundred twenty thousand three hundred six and 65/100 ($1,720,306.65) Dollars.

It is further ordered and adjudged the Plaintiff Janet A. McDougal shall receive one-third (⅓rd) of the following patents, patent applications and licensing agreements, and the Defendant John McDougal shall receive two-thirds (⅔rds) of the following patents, patent applications and licensing agreements listed below:[3]

The Defendant shall receive two-thirds (⅔rds) and the Plaintiff shall receive one-third (⅓rd) interest in all income from the patents, patent applications, licensing agreements and future licensing agreements after payment of direct and necessary expenses. Any documents transfering [sic] any rights or interests under the patents shall be executed by both parties or their legal representatives.

Defendant, John McDougal shall execute a Conformitory Assignment of said interest suitable for recording in the U.S. Patent and Trademark Office . . . .

Neither party shall enter into any licensing agreement or any other income generating agreement derived from the patents or patent applications without reasonable notice to and written approval by the other party; said approval not to be unreasonably withheld.

It is further ordered and adjudged that either party, within five (5) business days after receipt of a monthly[,] quarterly, semi-annual or annual payment from any licensee, shall provide the other party with copies of the corre-

---

[3] A later paragraph in the divorce judgment listed seventeen patents, one patent application, and various licensing agreements.

spondence, any accompanying accountings and the actual check issued by the licensee and within ten (10) days of receipt of said payment, the party receiving the check shall remit the one-third (⅓) or two-thirds (⅔rds) share as the case may be to the other party.

In a short discussion that followed the court's oral opinion, and at a second hearing before the judgment was entered, counsel for Mr. McDougal raised a number of concerns. With regard to the fifty-fifty split of the $3.4 million in gross income, counsel observed that about a million fewer dollars remained in the hands of the parties: Some funds had been spent over the years, significant costs had been incurred to obtain the $3.4 million, and there remained a sizeable 1990 tax liability on that income. Counsel reminded the court that burdening Mr. McDougal's share with the weight of those deductions, while giving Ms. McDougal an undiminished "half" share of $1.7 million, would actually mean that Ms. McDougal was receiving far more than 50% of the *net* proceeds. The court was unmoved, however:

> *The Court:* . . . As to the other issue, as to whether this Court referred to gross proceeds or net proceeds, this Court referred to gross proceeds, and there was several reasons for that. I think the record is extensive as to the finding of the Court as to the fault that was considered by the Court in the breakdown of this marriage.
>
> To supplement the record only briefly, if—it also has to be taken into consideration that while there was some expenses here, significant expenses to the 3.4 million dollars plus monies, the gross proceeds that were received from the patents and between the infringement lawsuits and the licensing agreements, it was Mr. McDougal who chose to conduct his finances in secret. It is also noted by this Court that the Plaintiff Janet McDougal never benefitted from any of this income during the course of the mar-

riage. In fact, there was testimony at trial that the first time that she knew that he had this kind of money and that they could of had a different lifestyle was after the divorce was filed and discovery showed how much and what the assets were of this marriage. It could have been that she could have helped avoid taxes or expenses.

Also, it is not as askewed [sic] a division as Defendant would state. Certainly her 1.7 million dollars is at least the rough estimate at this point. The 3 million plus is significantly—well, not significantly but maybe 80 percent of the proceeds that are left, the 2.4. But also the Defendant received all of his assets that he brought into the marriage; that is, close to $300,000 or if not a little bit more than $300—$300,000. He also leaves this marriage with at least 1 million dollars and two-thirds ownership right and his patents and royalties and licensing agreements from those patents. I think in view of all of that, that the judgment should reflect that it is one-half of the gross proceeds.

[*Counsel for Mr. McDougal*]: Your Honor, just a point of clarification, if I might. The Court stated just at the tail end of its supplemental opinion here that the Defendant also leaves the marriage with a million dollars plus this . . .

*The Court*: Between the half of the proceeds as well as the $300,000 of assets that he was awarded that he brought into the marriage.

[*Counsel for Mr. McDougal*]: Okay. I'm just indicating to the Court—I don't want to issue a surprise that those numbers don't add up. There is only 2.5 million in evidence at the time of trial. If she takes 1.7, he ends up with a little over $800,000.

*The Court*: Plus $300,000.

[*Counsel for Mr. McDougal*]: No, that's part of the 2.5.

*The Court*: All right. I'm sorry, if that's a mistake. At any rate, it doesn't change the opinion of the Court.

Counsel also sought clarification whether the court intended to award Ms. McDougal a continuing interest in the patents themselves. The court responded that such an award was its intention.

Mr. McDougal appealed,[4] but the Court of Appeals affirmed.[5] On further appeal, this Court initially denied leave to appeal. 445 Mich 919 (1994). However, we later granted leave to appeal "limited to the issue whether the trial court erred in its division of marital assets, including patent rights and patent royalties." 448 Mich 852 (1995).

II

The standard of review has been stated in *Sands v Sands*, 442 Mich 30, 34; 497 NW2d 493 (1993):

> In deciding a divorce action, the circuit court must make findings of fact and dispositional rulings. On appeal, the factual findings are to be upheld unless they are clearly erroneous. *Beason v Beason*, 435 Mich 791; 460 NW2d 207 (1990). A dispositional ruling, however, "should be affirmed unless the appellate court is left with the firm conviction that [it] was inequitable." *Sparks v Sparks*, 440 Mich 141, 152; 485 NW2d 893 (1992).[6]

We leave undisturbed the factual findings of the circuit court. The only question before us is whether the court erred in its dispositional ruling with regard to the patents, and the related rights and income. As stated in *Sands*, we will affirm unless we are left with the firm conviction that the circuit court's dispositive ruling was inequitable.

---

[4] Mr. McDougal learned before the trial that he was dying of lung cancer. His death came during the pendency of his appeal to the Court of Appeals. On order of this Court, his daughter has been substituted as the defendant.

[5] Unpublished memorandum opinion, issued August 11, 1993, reh den October 25, 1993 (Docket No. 141878).

[6] The standard of *Sparks*, 151-152, was also noted in *Fletcher v Fletcher*, 447 Mich 871, 881, n 4; 526 NW2d 889 (1994).

As indicated, the circuit court's dispositive ruling was based largely on its determination that Mr. McDougal was at fault for the breakdown of the marriage. With regard to the role that is properly played by "fault" in the formulation of a dispositional ruling, we explained in *Sparks*:

> While the Court of Appeals has invariably held that fault remains *a* factor, none of the cases has held that it is the *only* factor. We recognize that the conduct of the parties during the marriage may be relevant to the distribution of property, but the trial court must consider all the relevant factors and not assign disproportionate weight to any one circumstance. [440 Mich 158 (emphasis in original).]

In both *Sparks*, 440 Mich 158-160, and *Sands*, 442 Mich 34-36, we continued:

> It is not desirable, or feasible, for us to establish a rigid framework for applying the relevant factors. The trial court is given broad discretion in fashioning its rulings and there can be no strict mathematical formulations. See *Hallett v Hallett*, 279 Mich 246; 271 NW 748 (1937); *Cartwright v Cartwright*, 341 Mich 68; 67 NW2d 183 (1954). But, as we have recognized before, while the division need not be equal, it must be equitable. *Christofferson v Christofferson*, 363 Mich 421; 109 NW2d 848 (1961). Just as the final division may not be equal, the factors to be considered will not always be equal. Indeed, there will be many cases where some, or even most, of the factors will be irrelevant. But where any of the factors delineated in this opinion are relevant to the value of the property or to the needs of the parties, the trial court shall make specific findings of fact regarding those factors. It is hoped that this requirement will result in greater consistency and provide for more effective and meaningful appellate review.
>
> As acknowledged above, the division of property is not governed by any set rules. Nevertheless, this Court has established certain principles of general application. In

*Johnson v Johnson*, 346 Mich 418, 431; 78 NW2d 216 (1956), we said:

"The portion of property awarded to each party depends upon all the equitable factors involved, including the following: source of property, contribution towards its acquisition, the years of married life, the needs of the parties, their earning ability and also the cause for divorce."

These general standards have been refined and expanded upon by the Court of Appeals, and we readily acknowledge that additional factors, beyond those listed in *Johnson*, may be relevant to the disposition of assets. We hold that the following factors are to be considered wherever they are relevant to the circumstances of the particular case: (1) duration of the marriage, (2) contributions of the parties to the marital estate, (3) age of the parties, (4) health of the parties, (5) life status of the parties, (6) necessities and circumstances of the parties, (7) earning abilities of the parties, (8) past relations and conduct of the parties, and (9) general principles of equity. *Perrin v Perrin*, 169 Mich App 18, 22; 425 NW2d 494 (1988). There may even be additional factors that are relevant to a particular case. For example, the court may choose to consider the interruption of the personal career or education of either party. The determination of relevant factors will vary depending on the facts and circumstances of the case.

.III

In its analysis of the present case, the circuit court touched on many of the factors named in *Sparks* and *Sands*. However, as in *Sparks*, the circuit court has erred by placing excessive weight on the factor of fault.

In *Sparks*, an episode of marital infidelity at the conclusion of a twenty-six-year marriage persuaded the circuit court to make a 75-25 division of the property. Upon review, we concluded that the concept of fault had been given "disproportionate weight." 440

Mich 160, 163. In *Sands*, we further explained that "a judge's role is to achieve equity, not to 'punish' one of the parties." 442 Mich 36-37.

In the present case, the circuit court has found that the divorce was the fault of Mr. McDougal. His wrongful acts, particularly the September 1989 assault of Ms. McDougal, easily allow such a finding. However, as in *Sparks*, fault is an element in the search for an *equitable* division—it is not a punitive basis for an inequitable division. We cannot agree that the element of fault in this case supports the extreme financial penalties imposed by the circuit court.[7]

Bearing in mind not just fault, but also (1) the eight-year duration of this marriage, (2) the significant contributions of both parties to the marital estate,[8] (3) the ages of the parties, including the twenty-two-year age difference between them, (4) the good health of Ms. McDougal and the terminal illness of Mr. McDougal, (5) Ms. McDougal's employment and Mr. McDougal's retirement, (6) the "necessities and circumstances" of the parties, (7) Ms. McDougal's $46,000 annual salary and the various sources of Mr. McDougal's earnings, including the patents, (8) the actions of these parties before and during the mar-

---

[7] While not minimizing the fault of Mr. McDougal, we note that some elements of his behavior were unfortunate, but not outrageous. For example, a decision to file separate tax returns, while a path commonly avoided by married couples, is not wrongdoing per se. We agree with the circuit court that Mr. McDougal's change of heart concerning children (and his withholding of physical affection) was quite unfair. Yet it is not shockingly unforeseeable that a retiree in his mid-60s, unhappily married for the third time, but with adult children from an earlier marriage, might have second thoughts about becoming a father again.

[8] Again, Ms. McDougal's significant contribution lies neither in the invention nor in securing the principal patents. Rather, she assisted Mr. McDougal's later efforts to convert these *potentially* valuable assets into a substantial income source.

riage, and (9) general principles of equity, we are firmly convinced that the circuit court's dispositive ruling was inequitable.

A substantial award to Ms. McDougal is appropriate in this case. However, the circuit court has given Ms. McDougal far more of the parties' financial assets than is equitable. She is slated to receive most of the parties' financial assets, as well as a continuing interest in the patents themselves.[9]

We reverse the judgment of the Court of Appeals, and remand the case to circuit court for further proceedings.

On remand, the circuit court shall make such additional findings as are necessary, and shall enter a new dispositive ruling with regard to the patents and the patent-related income. The new judgment of the circuit court should reflect a division of income from licensing agreements that were formulated during the marriage, as well as from any renewals of such agreements. New agreements executed after the end of the marriage should result in no income to Ms. McDougal.[10]

In light of Ms. McDougal's pending receipt of a very substantial cash award, we see no need to grant Ms. McDougal any future rights in the patents them-

---

[9] Every divorce case must be evaluated on its own merits. However, it would be a rare divorcing couple who would benefit from a judgment that requires them to maintain an ongoing business relationship.

[10] We are aware that licensing agreements were reached with Volkswagen and Volvo after the complaint was filed. Although they preceded the divorce judgment, we are persuaded on this record, in light of the factors mentioned in the text of this opinion, that Ms. McDougal should not share in the proceeds of those two agreements.

selves.[11] The new judgment on remand shall provide that the patents and licensing agreements are the property of the defendant, subject to the defendant's obligation to share the funds generated from those assets, as provided in the new judgment on remand.

We do not retain jurisdiction.

BRICKLEY, C.J., and CAVANAGH, BOYLE, RILEY, and MALLETT, JJ., concurred.

LEVIN, J., concurred only in the result.

WEAVER, J., took no part in the decision of this case.

---

[11] This renders moot the issue whether intellectual property was properly awarded to the noncreator in this divorce proceeding.