*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

WENDELL DAVID LAWRENCE,

UNPUBLISHED
November 20, 2025
Plaintiff-Appellant,
11:22 AM

v

No. 369213
Oakland Circuit Court
Family Division
LINDA SHARYN DELISSE LAWRENCE,
LC No. 2022-511622-DO

Defendant-Appellee.

Before: K. F. KELLY, P.J., and BORRELLO and CAMERON, JJ.

PER CURIAM.

In this divorce action, plaintiff appeals by right the judgment of divorce entered following a bench trial. On appeal, plaintiff challenges the trial court's decisions regarding the property distribution, spousal support, and the award of attorney fees to defendant. For the reasons set forth in this opinion, we affirm in part, vacate in part, and remand for further proceedings.

## I. BACKGROUND

This case arises out of the dissolution of the septuagenarian parties' 37-year marriage. The parties were married on July 27, 1986, and plaintiff filed for divorce on February 14, 2022. The couple had one daughter, Alana Lawrence, who was an adult by the time plaintiff filed for divorce. At the time of trial, Alana was 33 years old and lived in Glendale, California. She had moved out of the parties' home in 2008, when she was 18 years old.

By the time the trial began, plaintiff was 74 years old. He was a dentist and currently owned his own practice with five employees. Plaintiff had opened his own practice approximately 20 or 25 years ago, but he had been practicing dentistry for 46 years. Plaintiff testified that he wanted to retire and that he was currently attempting to sell his practice. Regarding his health, plaintiff indicated that he was "rather burnt out" from the "financial burdens" and "anxiety" that he attributed to "practicing dentistry for so long." Plaintiff reported that he had mild hypertension, sleep apnea, anxiety (for which he had been prescribed medication), and high blood pressure (for which he also had been prescribed medication). He also stated, "I'm not as sharp and not as quick and fast as I used to be in treatment." Plaintiff, who identified himself as Seventh Day Adventist,

was also a member of multiple church-related groups. These groups involved seminars, conventions, events, and mission trips.

Defendant was 73 at the time of trial, and she was not employed. She had a college degree in interior design that she obtained in 1982. Defendant testified that she was last employed in 1991 when she worked as the director of design at the Office Pavilion Herman Miller dealership. From 1991 to 1994, she worked as an independent contractor and performed work for Herman Miller and Compuware. Defendant explained that she stopped working outside the home in 1994 because Alana was "getting older" and "having health issues," and defendant "wanted to spend more time with her until we solved her health issues." Alana was four years old at the time. Defendant home schooled Alana from kindergarten through 12th grade. When Alana went to college, defendant took some community college classes. Defendant took care of the household, and she was also involved with various church activities and accompanied plaintiff on mission trips. Defendant testified that she began experiencing health issues in 2018. Her health issues included knee and leg problems, vertigo, and immune system issues.

Plaintiff testified that for approximately the last 16 to 17 years before plaintiff filed for divorce, defendant had been responsible for the office payroll, gathering tax information for the accountant, receiving office bank and credit card statements, receiving business loan statements, and categorizing expenditures for the practice. According to plaintiff, he believed that defendant knew more about the practice's financial affairs than plaintiff. Plaintiff and his accountant removed defendant from this role in the practice's finances when plaintiff filed for divorce in February 2022.

Defendant testified that she did the interior design work for plaintiff's dental offices and that she also did bookkeeping and payroll for the practice. According to defendant, she also assisted the practice by becoming trained as a dental assistant to help plaintiff in emergencies and by filling in for employees when they were unable to come to work. Nonetheless, defendant did not consider herself a "bookkeeper" for the practice, and she characterized her role as "data entry."

At some point in 2017, the dental practice experienced a serious financial crisis because it had amassed approximately $800,000 in debt. Plaintiff and defendant refinanced their house, which was almost paid off at the time, and took out approximately $300,000 in equity from their home to apply toward the debt of the dental practice.

According to defendant, she was not paid for her work in the dental practice, which she did to help and support the family. However, after the events in 2017, she asked plaintiff for an "allowance" based on the time she spent assisting in the dental practice. Defendant testified that she had always had to ask plaintiff for money before this time and that she wanted to ensure that she had her own money to spend after going through the 2017 crisis. Defendant was not paid through the dental practice's payroll; instead, plaintiff paid her by personal check from his personal account. Defendant did not have access to marital assets or plaintiff's personal bank accounts, but she had a credit card that she could use for purchases. Once she started receiving the allowance in 2019, she used that money to reimburse plaintiff for personal charges she incurred on her credit card. Plaintiff also apparently started giving defendant weekly checks after 2017 to be used toward paying off plaintiff's debts.

Defendant testified that in 2021, she only did payroll for the practice because she stopped receiving cancelled checks and bank statements for data entry. She was not responsible for collection of receivables, she was not responsible for paying bills for the practice (because plaintiff paid the bills), and she denied any understanding of the cashflow or profitability of the practice. When she was removed from her role in the practice in 2022, defendant's allowance ceased and she did not have any access to marital funds.

Plaintiff's employee, Kristin Koch, took over the payroll responsibilities for the dental practice from defendant once plaintiff filed for divorce in 2022. Koch had originally been hired in September or October 2021 as a dental assistant. At some point, Koch also became the "zoom whitening specialist." However, she was promoted to office financial manager in December 2021 after plaintiff "discovered that she had skills in the financial part of the business." Koch was interviewed by plaintiff's accountant, Linda Glasser, and plaintiff increased Koch's pay from $20 per hour to approximately $42 or $44 per hour. Koch began her payroll duties in February 2022. Plaintiff testified that he paid for Koch's car repair of approximately $700 to $800 in the summer of 2022. When asked whether there was a business justification for this expenditure, plaintiff explained that "she had worked so hard to bring the office books back in right standing" after some apparent longstanding inaccuracies and deficiencies. Plaintiff claimed that Koch's work resulted in bringing the practice approximately $300,000 in revenue from previously unpaid bills. Plaintiff testified that he had also previously paid expenses, such as car repairs, on behalf of other employees as an employment benefit. Plaintiff also paid $1,500 for an employee's wedding reception.

As previously stated, plaintiff filed for divorce in February 2022. According to plaintiff, his home environment with defendant was "very stressful" with "no communication," and he and defendant had been living like "bad roommates" for over 25 years. They sometimes would not speak to each other for multiple days. Plaintiff testified that 25 years ago, defendant had moved out of the marital bedroom because "she just didn't want to have anything to do with" him. Defendant would only sleep in the marital bedroom to maintain "appearances" when guests visited and stayed in the home overnight. During these instances, defendant would frequently sleep on the couch in the bedroom. Defendant disagreed with plaintiff's claims. She stated that she sometimes slept in a room other than the couple's bedroom beginning in 2005 or 2006, but she indicated that "it wasn't every night," and "[i]t was back and forth."

Defendant indicated that leading up to the time that plaintiff filed for divorce, plaintiff had begun staying out later and going to bed later. Plaintiff was away from home during times that he normally would have been home. Defendant also noticed that plaintiff suddenly had a second cell phone and that he started receiving telephone calls late at night.

Plaintiff's cell phone records showed numerous phone calls and text messages between plaintiff's two cell phone numbers and Koch's cell phone number beginning in October 2021. These included extended length calls between plaintiff and Koch in the middle of the night and on weekends. The calls occurred "on a regular basis," including on holidays, and multiple calls were more than two hours long. There was additional evidence that plaintiff transferred money to Koch through PayPal, rented a car for her in December 2021, and wrote an approximately $980 check to an automotive repair garage in December 2021. Defendant testified that she found women's clothing, that did not belong to defendant, among plaintiff's belongings and in his gym bag.

-3-

Plaintiff's personal credit card statements showed that his monthly charges at the health club where he had an individual membership more than doubled. Defendant testified that she did not have a membership at this club and that she believed that plaintiff purchased an additional membership for Koch.

There was evidence that on December 31, 2021, plaintiff and Koch were the only two people working in plaintiff's dental office. According to plaintiff, a patient required extensive emergency dental treatment that day, even though it was a holiday, and Koch was the only employee who was available that day to assist plaintiff. Koch was paid "double time" for that day. Plaintiff testified, "Anybody who works on a holiday we always pay double time." However, defendant testified that "it was the first time in 27 years that someone was offered to be paid double time" and that she and plaintiff had an argument over this issue.

In February 2022, plaintiff traveled to California with Koch. Plaintiff testified that he had intended to attend a dental training session with Koch and visit Alana. However, plaintiff and Koch missed their original flight, and the first-class plane tickets plaintiff had purchased were non-refundable. They apparently took a different flight but arrived in California too late to attend the training session. While in California, plaintiff, Koch, and Alana all stayed together in an Airbnb with three separate bedrooms. Plaintiff explained that the Airbnb was much less expensive than three hotel rooms, and he denied ever sleeping in the same bedroom as Koch. Plaintiff also testified that he had previously covered the expenses for other employees to attend out-of-town trainings and that he had also previously traveled with other employees to attend out-of-town conferences. Plaintiff denied ever engaging in any kind of physical intimacy with anyone other than defendant during the marriage.

Plaintiff testified about the financial support he provided for his daughter Alana. The lease for Alana's vehicle, a 2019 Lexus, was in plaintiff's name, and he paid the approximately $320 to $350 monthly car payment. Plaintiff also paid for the insurance on the vehicle, and plaintiff paid the costs for Alana's rent, utilities, health insurance, renters' insurance, cell phone, storage facility and apartment cleaning service. Plaintiff additionally transferred money to Alana through cash apps such as PayPal, Venmo, and Zelle. Alana incurred significant medical bills from co-pays and ambulance services, and plaintiff paid these bills.

Defendant created a summary of the expenditures plaintiff made on Alana's behalf, from 2019 to 2022, based on plaintiff's banking and credit card statements. Defendant calculated that plaintiff spent $167,014.80 in 2019, $157,689.91 in 2020, $138,374.91 in 2021, and $147,647.43 in 2022 on Alana's expenses and support. The total amount spent for 2019 to 2022 was $610,727.05. Defendant testified that she did not know that plaintiff was directing this amount of money to Alana and that plaintiff never disclosed the full amount of financial support he was providing for Alana. Defendant also testified that she was not aware of any money that plaintiff saved or contributed to retirement accounts during these years.

Defendant testified that plaintiff ignored her input regarding expenditures for Alana and that he secured apartments and leased vehicles for Alana without consulting defendant. Defendant believed the financial support to Alana should stop and that Alana was fully capable of supporting herself. However, she acknowledged that she had previously been willing to partially support

-4-

Alana. She also testified that, somewhat contradictorily, she has never agreed to financially support Alana since Alana graduated from high school.

Plaintiff believed that Alana required his financial support "to survive at a -- at a humane level" because of her serious mental and physical issues that included autism and complications arising from car accidents. He seemed to suggest that he thought that she otherwise could only survive in a "homeless shelter." Plaintiff did not believe that his expenditures on Alana were unconscionable or a waste of marital assets. Plaintiff denied that he made all of the decisions regarding Alana and denied that defendant did not have a voice in making those decisions. Plaintiff testified that defendant expressed some concern about the amount spent on Alana's rent but never asked plaintiff to stop financially supporting Alana. He also claimed that defendant was involved in leasing vehicles for Alana and that defendant had not objected, although defendant was apparently unhappy about the most recently leased vehicle. He indicated that defendant was not involved in the most recent vehicle transaction and that defendant did not object to his payment of Alana's health insurance.

Plaintiff testified that Alana was the social media coordinator for his dental practice, which entailed making advertising posts on social media platforms, educating patients on taking better care of their teeth, and managing the website. Plaintiff stated that Alana could work remotely on her own time, that she typically worked about 9 to 15 hours per week, and that her work generated about 15 to 20 new patients per month. In her testimony, Alana confirmed this work arrangement. She indicated that she did not perform this kind of social media posting work for any other companies. Alana sometimes worked in exchange for plaintiff paying various bills for her. She testified that she did not want defendant to know about the money she earned from her work for the dental practice. Plaintiff paid her for this work through his personal account rather than the business account.

Alana testified that she had been diagnosed with Fibromyalgia, ADHD, chronic back pain, post-traumatic stress disorder, generalized anxiety disorder, and panic disorder. She also testified that she had been diagnosed with Asperger's Syndrome when she was 26 years old and that she was on "the higher end" of the "Autism spectrum." Alana explained that she could not fly on airplanes anymore because she had been diagnosed with Supraventricular tachycardia and her heart rate increased uncontrollably such that her cardiologist had instructed her to refrain from flying. However, she also later appeared to testify that her new cardiologist recognized that Alana felt it was stressful to fly, but did not actually prohibit her from flying, even though her first cardiologist had prohibited her from flying. Her new cardiologist apparently had not finished evaluating her condition.

The evidence reflected that plaintiff received $2,800 per month from Social Security. Plaintiff's income tax returns indicated that he had income of $522,365 for 2017, $521,958 for 2018, $323,917 for 2019, $276,888 for 2020, and $327,720 for 2021. The gross receipts for the dental practice were $988,297 in 2019, $829,552 in 2020, and $1,400,171 in 2021. However, there was testimony that the dental practice apparently owed over $124,000 in unpaid federal payroll taxes, not including penalties and interest. There was also testimony that the practice owed approximately $40,000 on an equipment loan. An updated balance sheet submitted at the end of trial reflected federal and state tax debt for the practice exceeding $170,000 and other debts exceeding $60,000.

Defendant testified that she received $1,585 per month from Social Security after deductions for health care and a penalty that was based on plaintiff's income exceeding a certain amount. She requested a monthly spousal support award of $11,500. Defendant explained that she calculated this figure by first determining that plaintiff's average yearly income over the last five years was $450,00 and then deducting 40% for taxes and dividing the remainder in half. Thus, she claimed that she was asking for 50% of plaintiff's net income.

The trial court issued a 52-page written opinion, with an additional 21-page appendix, setting forth its findings of fact and conclusions of law. The primary issues decided by the trial court involved the distribution of the marital estate and spousal support.

Regarding the division of the marital estate, the trial court first addressed the amount by which plaintiff dissipated the marital estate through his financial support of Alana's living expenses without defendant's knowledge or approval. The court found that although defendant submitted reliable evidence that plaintiff had improperly expended $610,727 for Alana's support from 2019 through 2022, defendant had nonetheless "reluctantly acquiesced" to payments for Alana's "rent, car payments, and health insurance" that were included in defendant's calculation and that these expenditures should therefore be excluded from the amount dissipated from the marital estate by plaintiff. Consequently, the trial court found that plaintiff wrongfully dissipated $423,404.72 in marital assets through his "verifiable secreted funds expended on Alana's behalf" and that this amount would be "included in the marital assets for purposes of dividing the marital estate."

The trial court next addressed the *Sparks*[1] factors. The court found that both parties were in their mid-seventies and were in similar states of health, which the court thus found to be a relatively insignificant factor. The trial court further found that the parties made equal contributions to the marital estate throughout the marriage, with plaintiff practicing as a dentist and defendant maintaining the home and caring for Alana during her childhood. The court found that although both parties were college educated, there was a significant disparity in their respective earning abilities because plaintiff held an advanced degree, had been practicing as a dentist for many years, and continued to both earn a salary and collect social security, while defendant had not worked outside the home since 1994 and collected less in social security than plaintiff. The court found that there was not a high likelihood that defendant could return to active employment in her area of specialty at this point.

Regarding the parties' past relations and conduct, the trial court found that "the impetus for the breakdown of the parties' marriage largely stems from Plaintiff Husband's conduct." The court explained that "[a]lthough professing a passionless marriage existed for in excess of two decades, Plaintiff Husband filed for divorce on the heels of his developing relationship with Ms. Koch" and that "the relationship with Ms. Koch included money sent via PayPal, gifts, a gym membership, a rental vehicle, costly repairs for her vehicle, first class airfare, accommodations for a three-bedroom rental in California, and untold after-hours phone calls and texting." Plaintiff's testimony was found to be "deceitful and unrepentant." The trial court thus determined that plaintiff dissipated marital assets for his mistress and was at fault for the breakdown of the

---

[1] *Sparks v Sparks*, 440 Mich 141; 485 NW2d 893 (1992).

marriage. The court concluded, "Based on an examination of all of the *Sparks* factors, the Court finds an equitable distribution of marital assets (including dissipated marital assets) favors an award of 60% in favor of Defendant Wife and 40% in favor of Plaintiff Husband."

The trial court then discussed the value of the parties' various bank accounts (approximately $16,000) and retirement accounts (approximately $32,000). The equitable value of the marital home was deemed $345,008 pursuant to the parties' agreement. Noting that the dental practice had been valued by the broker at $900,000 and that there had been one offer for $746,000, the court ordered that the dental practice would be marketed and sold pursuant to the parties' stipulation. However, the court ordered that plaintiff would be solely responsible for any business debt stemming from penalties for untimely paid payroll taxes. Plaintiff was ordered to maintain his life insurance policies. The parties were each awarded one of their joint vehicles. Plaintiff was ordered to be solely responsible for his personal credit card debt of approximately $96,000, and defendant was ordered to be solely responsible for her credit card balance of approximately $300. The court stated, "in equalizing the marital estate, the parties shall avoid any double dip in the accounting."

Next, the trial court addressed spousal support. The court cited the factors to consider in awarding spousal support, which largely mirrored the factors for dividing the marital estate, and the court incorporated its findings from the property division regarding the overlapping factors. With respect to the spousal support factors that did not overlap with the *Sparks* factors, the trial court first considered plaintiff's contention that he was responsible for supporting Alana. The trial court found that the testimony regarding Alana's limitations and inability to work was not credible and that plaintiff was not responsible for her ongoing financial support. The trial court next found that both parties had previously "enjoyed a modest but comfortable lifestyle" and that a permanent monthly spousal support award of $6,641.00 in defendant's favor was appropriate.

The trial court also determined that defendant was entitled to an award of attorney fees based on defendant's financial need and as a sanction for plaintiff's acts of withholding pertinent financial information during discovery that was available to him and hiding expenditures of marital funds involving Alana and Koch. The trial court addressed the reasonableness of defendant's requested attorney fees and determined that she was entitled to $91,265.46 in attorney fees and costs.

The trial court denied plaintiff's motion for reconsideration. However, the court provided the following clarification of its orders:

> [W]ith respect to what was deemed Defendant Wife's "retirement account" funded by her "allowance," the account was indeed marital property such that the remaining balance shall be divided in accordance with the Court's directive. The Court took into consideration Plaintiff Husband's discontinuation of the payment of any allowance when the divorce proceedings were initiated and the fact Defendant Wife utilized these funds in the account for her day-to-day needs during the pendency of these proceedings. To the extent funds in the account were utilized to pay Defendant Wife's attorney fees, the parties are to account for the use of those funds in addressing the award of attorney fees. However, the Bill of Particulars specifically distinguished which fees were awarded as a sanction versus which fees

should be paid as an award of attorney fees based on need and ability to pay. In terms of the timing for the spousal support award, the parties shall continue to abide by the status quo order until such time as the marital home is sold. Therefore, the onset for spousal support payments should coincide with the closing on the marital home.

A judgment of divorce consistent with the court's prior written orders was entered. The trial court also ordered plaintiff to additionally pay defendant $254,042.83, which represented defendant's share of the $423,404.72 in marital assets that the court determined were wrongfully dissipated by plaintiff. Plaintiff now appeals.

## II. PROPERTY DISTRIBUTION

Plaintiff first argues that the trial court's property division was inequitable.

"In a divorce action, this Court reviews for clear error a trial court's factual findings on the division of marital property . . . ." *Hodge v Parks*, 303 Mich App 552, 554; 844 NW2d 189 (2014). "Findings of fact are clearly erroneous when this Court is left with the definite and firm conviction that a mistake has been made," and "[s]pecial deference is afforded to a trial court's factual findings that are based on witness credibility." *Id*. at 555 (quotation marks and citation omitted). " 'If the findings of fact are upheld, [this Court] must decide whether the dispositive ruling was fair and equitable in light of those facts.' " *Richards v Richards*, 310 Mich App 683, 693; 874 NW2d 704 (2015), quoting *Sparks v Sparks*, 440 Mich 141, 151–152; 485 NW2d 893 (1992). "The trial court's dispositional ruling will be upheld, unless this Court is 'left with the firm conviction that the division was inequitable.' " *Richards*, 310 Mich App at 694, quoting *Sparks*, 440 Mich at 152.

"The goal in distributing marital assets in a divorce proceeding is to reach an equitable distribution of property in light of all the circumstances." *Berger v Berger*, 277 Mich App 700, 716-717; 747 NW2d 336 (2008). "The trial court need not divide the marital estate into mathematically equal portions, but any significant departure from congruence must be clearly explained." *Hodge*, 303 Mich App at 561 (quotation marks and citation omitted). In determining an equitable property division,

> the following factors are to be considered wherever they are relevant to the circumstances of the particular case: (1) duration of the marriage, (2) contributions of the parties to the marital estate, (3) age of the parties, (4) health of the parties, (5) life status of the parties, (6) necessities and circumstances of the parties, (7) earning abilities of the parties, (8) past relations and conduct of the parties, and (9) general principles of equity. There may even be additional factors that are relevant to a particular case. For example, the court may choose to consider the interruption of the personal career or education of either party. The determination of relevant factors will vary depending on the facts and circumstances of the case. [*Sparks*, 440 Mich at 159-160 (citation omitted).]

There is no "rigid framework for applying the relevant factors." *Id*. at 158. "The trial court is given broad discretion in fashioning its rulings and there can be no strict mathematical

formulations." *Id*. at 158-159. The "conduct of the parties during the marriage may be relevant to the distribution of property, but the trial court must consider all the relevant factors and not assign disproportionate weight to any one circumstance," including fault. *Id*. at 158.

In beginning the analysis, it is first necessary to address plaintiff's challenges to certain factual findings by the trial court. *Berger*, 277 Mich App at 717. First, plaintiff argues that the trial court's findings regarding fault based on the alleged relationship between plaintiff and Koch were clearly erroneous because they were not supported by the record. The trial court found that plaintiff was primarily at fault for the breakdown of the marriage because he abruptly filed for divorce after developing a relationship with Koch that included gifts, first-class air travel, lodging, and outside of work phone calls and texting.

The record contains ample evidence to support the court's finding regarding the nature of plaintiff's relationship with Koch. There was evidence that plaintiff and Koch engaged in long telephone conversations in the middle of the night on multiple occasions, stayed in the same Airbnb and flew first class on a trip to California, and were in frequent cell phone and text communication. The trial court also found plaintiff's testimony deceitful. Thus, review of the record, along with the deference afforded to the trial court's assessment of witness credibility, does not lead to a definite and firm conviction that the trial court made a mistake in finding plaintiff was primarily at fault for the breakdown of the marriage due to his relationship with Koch, and plaintiff has failed to establish this finding was clearly erroneous. *Hodge*, 303 Mich App at 554-555.

Next, plaintiff also argues that the trial court clearly erred by finding him at fault for the breakdown of the marriage based on the financial support he provided to Alana because, according to plaintiff, the parties always supported Alana throughout the marriage and defendant was aware of this financial support. The trial court essentially found that plaintiff spent an excessive amount on financially supporting the parties' adult daughter without disclosing that amount to defendant, while simultaneously finding that defendant had actually acquiesced to some of the financial support about which she claimed to be unaware. Although there was somewhat conflicting evidence on this point, the evidence does not lead to a definite and firm conviction that the trial court made a mistake. *Id*. Plaintiff merely wants to relitigate this issue on appeal, which is insufficient to establish clear error. See *id*.

Plaintiff next suggests that the trial court improperly considered funds spent on Alana as improperly dissipated marital assets that could be included within the marital estate. "[W]hen a party has dissipated marital assets without the fault of the other spouse, the value of the dissipated assets may be included in the marital estate." *Woodington v Shokoohi*, 288 Mich App 352, 368; 792 NW2d 63 (2010). The trial court in a divorce action "may determine whether a third party has acted in concert with a spouse to deprive the other spouse of his or her share of the marital estate," and if "the answer is 'yes,' then the trial court may fashion a remedy to ensure an equitable division of marital assets." *Cassidy v Cassidy*, 318 Mich App 463, 493; 899 NW2d 65 (2017). "The court . . . has authority to find that assets were fraudulently transferred to a third party to deprive a spouse of an interest in marital property." *Thames v Thames*, 191 Mich App 299, 302; 477 NW2d 496 (1991).

Here, however, plaintiff merely argues whether the factual evidence supported such a finding, essentially treating his appeal as a second trial, and plaintiff does not cite any legal

authority to support the argument that the trial court was somehow prohibited from making this finding. Therefore, regarding plaintiff's attempt to argue that supporting his adult daughter during the marriage did not constitute wrongful dissipation of marital assets, we note that plaintiff's failure to adequately develop or clarify this argument leads us to conclude that it has been abandoned on appeal. "An appellant may not merely announce a position then leave it to this Court to discover and rationalize the basis for the appellant's claims; nor may an appellant give an issue only cursory treatment with little or no citation of authority." *Cheesman v Williams*, 311 Mich App 147, 161; 874 NW2d 385 (2015). "[T]his Court will not search for authority to sustain or reject a party's position." *Id*. (quotation marks and citation omitted).

Turning to the trial court's dispositional ruling, see *Richards*, 310 Mich App at 693-694, plaintiff's primary complaint on appeal concerns his perception that the property distribution was inequitable. Plaintiff contends that the trial court failed to apply the *Sparks* factors and placed disproportionate weight on its assessment that plaintiff was at fault for the breakdown of the marriage, such that the trial court's 60/40 division of property was inequitable and punitive to plaintiff. Plaintiff specifically argues that the trial court failed to make sufficient findings regarding the *Sparks* factors, failed to analyze and apply all of the factors, failed to balance the factors and articulate how the overall property division satisfied general principles of equity, and disproportionately relied on fault to justify its property division.

First, it is evident from the trial court's extensive written opinion that it did apply the *Sparks* factors. The trial court cited the *Sparks* factors and properly explained that they constituted a non-exhaustive list of factors to be used in fashioning an equitable distribution. *Sparks*, 440 Mich at 159-160. The court noted the undisputed fact of the parties' 37-year marriage and that the parties were of similar ages and states of health. The court found that the parties contributed equally to the marital estate, with plaintiff practicing as a dentist and defendant running the household and caring for Alana during her childhood. Regarding the parties' earning abilities, the trial court found that although both parties were college educated, there was great disparity in their respective earning abilities because plaintiff had an advanced degree and extensive experience as a practicing dentist while a return to the workforce did not seem likely for defendant, who had not worked in her area of specialty since 1994 and had only performed data entry tasks for the dental practice since that time. With respect to the parties' past relations and conduct, the court found that plaintiff was primarily at fault for the breakdown of the marriage because he abruptly ended the 37-year marriage after developing a relationship with Koch that involved gifts, first-class travel, and a gym membership. The trial court expressly relied on its consideration of the *Sparks* factors in reaching its property distribution ruling.

Thus, contrary to plaintiff's assertions, the trial court considered the relevant factors as applicable to the facts and circumstances of the present case. *Sparks*, 440 Mich at 160. The court also made specific findings of fact regarding the relevant factors. *Id*. at 159. Moreover, there is no rigid framework or mathematical formula for applying the factors. *Id*. at 158-159.

However, the real focus of plaintiff's appellate argument in this case is his contention that the trial court placed undue weight on the fault findings to reach an inequitable, rather than an equitable, property distribution. "[T]he conduct of the parties during the marriage may be relevant to the distribution of property, but the trial court must consider all the relevant factors and not assign disproportionate weight to any one circumstance." *Id*. at 158. "Marital misconduct is only

-10-

one factor among many and should not be dispositive." *Id*. at 163. In *McDougal v McDougal*, 451 Mich 80, 90; 545 NW2d 357 (1996), our Supreme Court stated, "fault is an element in the search for an *equitable* division——it is not a punitive basis for an inequitable division."

Our Supreme Court has reversed a trial court's property distribution in situations where the trial court gave disproportionate weight to the element of fault to justify a grossly inequitable property division. In *Sparks*, the Court reversed a property distribution that awarded 75% of the marital assets to the husband and 25% to the wife that had been based solely on the trial court's assessment that the wife was at fault because of her sexual infidelity. *Sparks*, 440 Mich at 160-163. In that case, the trial court had completely neglected to make any findings on many other relevant factors. *Id*. at 162-163.

In *McDougal*, the Court reversed the property distribution that had awarded the wife "far more of the parties' financial assets than [was] equitable" because she was "slated to receive most of the parties' financial assets, as well as a continuing interest" in the husband's patents that were issued to him before the marriage. *McDougal*, 451 Mich at 91. The trial court had based the distribution primarily on its determination that the husband was at fault for the breakdown of the marriage. *Id*. at 83, 85-86, 90. The Supreme Court acknowledged the wife's contribution to the patent *enforcement* efforts that occurred during the marriage and resulted in substantial income. *Id*. at 82. However, the Supreme Court determined that other *Sparks* factors demonstrated that the award of an ongoing financial interest in the husband's patents combined with the sizeable award of current assets was inequitable and that the trial court had given excessive weight to the factor of fault. *Id*. at 89-91.

Here, although the trial court clearly considered fault as a factor, its decision was not based solely on that factor. The trial court also determined that there was a significant disparity between the parties in earning potential, with defendant collecting less than plaintiff in social security and having a low likelihood of being able to reenter the workforce in her area of expertise. Plaintiff, in contrast, had been practicing as a dentist for decades and owned his own practice. Moreover, the trial court's deviation from mathematical equality was not as extreme as the disparities in *Sparks* and *McDougal*. The factual circumstances of this case are thus clearly distinguishable from those in *Sparks* and *McDougal*. Plaintiff has not demonstrated that the trial court placed excessive weight on the issue of fault or that the trial court ordered an inequitable property division.

Next, to the extent plaintiff complains about the allocation of responsibility for various debts and liabilities to him, plaintiff again appears to be attempting to relitigate the trial and he does not provide any form of cogently developed legal argument to support his claimed entitlement to relief. Therefore, these matters are also deemed abandoned. *Cheesman*, 311 Mich App at 161.

Accordingly, plaintiff has failed to demonstrate that this Court should be left with a firm conviction that the property division was inequitable, and the trial court's ruling is therefore affirmed. *Richards*, 310 Mich App at 694.

Plaintiff next argues that this matter should be heard by a different judge on remand because of an allegedly improper relationship between the trial judge's staff attorney and defendant's attorney's law firm because the staff attorney's daughter was a law student intern at that firm with no contact or involvement with this case. Because plaintiff has not established that

he is entitled to appellate relief and a remand regarding the property division, and because plaintiff does not argue that the allegedly improper relationship itself provides an independent basis for appellate relief on this issue, the issue is moot. A matter is moot "when it presents only abstract questions of law that do not rest upon existing facts or rights" or "when an event occurs that renders it impossible for a reviewing court to grant relief." *B P 7 v Bureau of State Lottery*, 231 Mich App 356, 359; 586 NW2d 117 (1998). This Court generally does not decide moot issues. *Id*. Moreover, plaintiff has not provided any authority requiring disqualification of the judge under these circumstances, nor has plaintiff provided any evidence actually showing improper influence or bias.

## III. SPOUSAL SUPPORT

Plaintiff next challenges the trial court's decision awarding spousal support to defendant.

"The same review standard applicable to the division of marital property applies to awards of spousal support." *Berger*, 277 Mich App at 727. Accordingly, the trial court's factual findings are reviewed for clear error and if the findings are not clearly erroneous, then this Court must "decide whether the dispositional ruling was fair and equitable in light of the facts." *Id*. "Whether to award spousal support is in the trial court's discretion . . . ." *Elahham*, 319 Mich App at 129 (quotation marks and citation omitted). The "trial court's decision regarding spousal support must be affirmed unless [this Court is] firmly convinced that it was inequitable." *Richards*, 310 Mich App at 690 (quotation marks and citation omitted).

"The award of spousal support is . . . within the trial court's discretion." *Berger*, 277 Mich App at 726. "The main objective of alimony is to balance the incomes and needs of the parties in a way that will not impoverish either party, and alimony is to be based on what is just and reasonable under the circumstances of the case." *Olson v Olson*, 256 Mich App 619, 631; 671 NW2d 64 (2003).

> Among the factors that should be considered are: (1) the past relations and conduct of the parties, (2) the length of the marriage, (3) the abilities of the parties to work, (4) the source and amount of property awarded to the parties, (5) the parties' ages, (6) the abilities of the parties to pay alimony, (7) the present situation of the parties, (8) the needs of the parties, (9) the parties' health, (10) the prior standard of living of the parties and whether either is responsible for the support of others, (11) contributions of the parties to the joint estate, (12) a party's fault in causing the divorce, (13) the effect of cohabitation on a party's financial status, and (14) general principles of equity. [*Id*.]

Here, the trial court did not consider plaintiff's ability to pay the amount of spousal support ordered. In setting the amount, the trial court simply stated, "As the Court must strive to place the parties in parity with one another, the Court finds a monthly spousal support award of $6,641.00 ($79,692.00 annually) is appropriate." Although the trial court's findings appear to support the general conclusion that *an* award of spousal support to defendant is appropriate, there are no findings connecting that conclusion with the amount awarded. There is no clear indication that the trial court made any finding regarding plaintiff's ability to pay any certain amount of spousal support in light of his income, debt liabilities, and property awarded in the property division

without simultaneously impoverishing plaintiff. *Id*. The amount of spousal support may be equitable, but the trial court failed to provide the factual findings necessary to allow meaningful appellate review of that question. It is also unclear how the trial court arrived at the amount it awarded, making it appear to be an arbitrarily selected amount.

Therefore, the spousal support award is vacated solely as to the amount of the award, and the matter remanded for the trial court to provide proper and sufficient findings of fact to justify the particular amount of spousal support it decides should be awarded. *Berger*, 277 Mich App at 727.[2] A trial court abuses its discretion by awarding spousal support without making adequate findings of fact to justify the amount of the award. *Olson*, 256 Mich App at 633-634.

IV. ATTORNEY FEES

Next, plaintiff challenges the award of attorney fees.

"This Court reviews a trial court's decision regarding whether to award attorney fees in a divorce action for an abuse of discretion," which occurs if "the trial court's decision falls outside the range of reasonable and principled outcomes." *Colen v Colen*, 331 Mich App 295, 300; 952 NW2d 558 (2020) (quotation marks and citation omitted). "Any findings of fact on which the trial court bases an award of attorney fees are reviewed for clear error, but questions of law are reviewed de novo." *Reed v Reed*, 265 Mich App 131, 164; 693 NW2d 825 (2005) (citations omitted).

As an initial matter, plaintiff argues that he was improperly denied an evidentiary hearing on the reasonableness of defendant's attorney fees. However, plaintiff waived this issue in the trial court. "Where . . . the party opposing the taxation of costs challenges the reasonableness of the fee requested, the trial court should inquire into the services actually rendered before approving the bill of costs. However, there is no error in failing to conduct an evidentiary hearing if the parties created a sufficient record to review the issue, and the court fully explained the reasons for its decision." *Cassidy*, 318 Mich App at 488 (quotation marks and citations omitted; ellipsis in original).

Here, plaintiff's counsel stated that he was "satisfied" with addressing the attorney fee issues in writing, and he thereby waived an evidentiary hearing on reasonableness. Moreover, the trial court conducted a brief hearing on the reasonableness of defendant's attorney's hourly rate, during which defendant's attorney testified.

"A waiver constitutes the intentional relinquishment of a known right," and a "waiver is shown through express declarations or declarations manifesting a party's purpose and intent." *Elahham*, 319 Mich App at 117 (quotation marks and citation omitted). Plaintiff's agreement to forgo a hearing and proceed through written submissions constituted a waiver of the evidentiary hearing. *Id*. "A party who waives a right is precluded from seeking appellate review based on a

---

[2] Because plaintiff did not request remand before a different judge, there is no need to address this issue that was raised in the context of a different issue on appeal. Moreover, plaintiff has not demonstrated, and there is nothing in the record that could lead us to conclude that plaintiff is entitled to remand before a different judge.

denial of that right because waiver eliminates any error." *The Cadle Co v City of Kentwood*, 285 Mich App 240, 255; 776 NW2d 145 (2009).

Next, plaintiff argues that the trial court erred by awarding attorney fees to defendant based on need, or as sanctions, as authorized by MCR 3.206(D).

"Under the 'American rule,' attorney fees are not recoverable as an element of costs or damages unless expressly allowed by statute, court rule, common-law exception, or contract." *Reed*, 265 Mich App at 164. In the divorce context, both statute and court rule provide potential authorization for an award of attorney fees, but "attorney fees are not recoverable as of right in divorce actions." *Id*.; MCL 552.13; MCR 3.206(D).

MCL 552.13(1) provides:

In every action brought, either for a divorce or for a separation, the court may require either party to pay alimony for the suitable maintenance of the adverse party, to pay such sums as shall be deemed proper and necessary to conserve any real or personal property owned by the parties or either of them, *and to pay any sums necessary to enable the adverse party to carry on or defend the action, during its pendency*. It may award costs against either party and award execution for the same, or it may direct such costs to be paid out of any property sequestered, or in the power of the court, or in the hands of a receiver. [Emphasis added.]

MCR 3.206(D) provides:

(1) A party may, at any time, request that the court order the other party to pay all or part of the attorney fees and expenses related to the action or a specific proceeding, including a post-judgment proceeding.

(2) A party who requests attorney fees and expenses must allege facts sufficient to show that:

(a) the party is unable to bear the expense of the action, including the expense of engaging in discovery appropriate for the matter, and that the other party is able to pay, or

(b) the attorney fees and expenses were incurred because the other party refused to comply with a previous court order, despite having the ability to comply, or engaged in discovery practices in violation of these rules.

This Court has explained that this court rule "provides two independent bases for awarding attorney fees and expenses." *Richards*, 310 Mich App at 700. Hence, "[a]ttorney fees in a divorce action are awarded only as necessary to enable a party to prosecute or defend a suit but are also authorized when the requesting party has been forced to incur expenses as a result of the other party's unreasonable conduct in the course of litigation." *Id*. (quotation marks and citation omitted). "Whereas MCR 3.206[(D)](2)(a) allows payment of attorney fees based on one party's inability to pay and the other party's ability to do so, MCR 3.206[(D)](2)(b) considers only a party's behavior, without reference to the ability to pay." *Id*. at 701.

-14-

Here, the trial court indicated its reliance on both MCR 3.206(D)(2)(a) and (b) to justify its attorney fee award. However, with respect to MCR 3.206(D)(2)(a), the trial court did not make any findings regarding plaintiff's financial status and ability to pay the awarded attorney fees *post-divorce judgment*. Instead, the court only made general and vague findings that plaintiff was historically the "primary breadwinner." The trial court's analysis in this respect thus suffered from the same deficiency as its spousal support analysis.

To support an award of attorney fees under MCR 3.206(D)(2)(a), in addition to finding that one spouse is financially unable to bear the expense of the litigation, the trial court *must also find that the other spouse has the present ability under all of the specific circumstances to contribute* to the fees for the spouse in need. *Loutts v Loutts (After Remand)*, 309 Mich App 203, 218; 871 NW2d 298 (2015). Consideration of the parties' respective financial situations and the equities involved implicates the parties' respective financial positions in light of the property distribution and spousal support awarded. *Id.* at 218-219. The trial court in the instant case failed to provide such findings, thereby precluding meaningful appellate review under this subrule. The standard for whether attorney fees may be awarded under MCR 3.206(D)(2)(a) is "more complex" than simply determining that one party has "fewer financial resources" than the other. *Colen*, 331 Mich App at 309.

With respect to MCR 3.206(D)(2)(b), the trial court found that plaintiff had increased the litigation costs by refusing to be forthcoming with information, asserting baseless challenges to subpoenas, and hiding marital expenditures. However, there do not appear to be any findings that all of the attorney fees awarded had a causal nexus with plaintiff's misconduct. The trial court attached an appendix to its opinion that consisted of a line-by-line billing statement submitted by defense counsel with descriptions of the work performed with respect to each billing item and the trial court's comments about why it was appropriately allowed. Many of the charges were approved by the trial court as reasonably related to the litigation generally but without any finding that the charges were incurred *as a result of plaintiff's misconduct.* This Court has concluded that a "trial court abused its discretion by awarding attorney fees without finding that defendant's conduct was unreasonable and that a causal connection existed between fees actually incurred and that conduct, and without finding that the fees so incurred were reasonable." *Reed*, 265 Mich App at 164. Here, the trial court failed to make a finding of such a causal connection with respect to some of the fees. The fact that the court found some of the fees were incurred as a result of plaintiff's misconduct does not by itself justify awarding all of the attorney fees incurred. *Id*.

The trial court's award of attorney fees is vacated, and we remand for the trial court to address the issue again and make proper findings of fact that will facilitate meaningful appellate review.[3]

---

[3] Plaintiff is not entitled to a remand before a different judge for the same reasons discussed in the context of his spousal support issue.

-15-

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.  No costs are awarded to either party.


/s/ Kirsten Frank Kelly
/s/ Stephen L. Borrello
/s/ Thomas C. Cameron